[Cite as *State v. Dehner*, 2013-Ohio-3576.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2012-12-090 |
| - vs - | : | O P I N I O N<br>8/19/2013 |
| | : | |
| RICHARD E. DEHNER, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2011 CR 01015


D. Vincent Faris, Clermont County Prosecuting Attorney, Judith A. Brant, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for plaintiff-appellee

R. Daniel Hannon, Clermont County Public Defender, Robert F. Benintendi, 10 South Third Street, Batavia, Ohio 45103, for defendant-appellant


**PIPER, J.**

{¶ 1}   Defendant-appellant, Richard Dehner, appeals his convictions and sentence in the Clermont County Court of Common Pleas for multiple counts of rape and gross sexual imposition.

{¶ 2}   When K.S. was five years old, she and her father, Mark, moved into her paternal grandmother's home because Mark was unable to financially support K.S. and

himself. Mark had custody of K.S. and K.S.'s mother did not have a relationship with her daughter or Mark. K.S.'s grandmother married Dehner, and Dehner became K.S.'s step-grandfather.

{¶ 3} When K.S. was approximately seven years old, she, Mark, K.S.'s grandmother, and Dehner moved into a house together. From the time that Dehner came to live with the family, he became the disciplinarian for K.S., often times leading to altercations with Mark over who should be disciplining K.S. When K.S. would want to visit friends or spend time away from the home, she would have to seek permission from Dehner. Dehner would also help provide K.S. with what she wanted or needed, such as paying fees for extracurricular activities or providing spending money.

{¶ 4} Dehner began inappropriately touching K.S. when she was approximately eight years old. At first, Dehner would touch K.S.'s buttock when she would give him a hug before bedtime. Dehner also played movies with sexual scenes when K.S. was in the room. K.S. stated that Dehner asked her to watch a pornographic video with her, but that the VCR destroyed the tape before they watched the movie together. When K.S. entered junior high, at approximately 10 or 11 years old, the touching and inappropriate behavior escalated.

{¶ 5} On Wednesday nights, K.S.'s grandmother and Mark would go to bingo, leaving Dehner and K.S. alone in the house together. During this time, Dehner would come to where K.S. was sitting on the couch watching television, and begin to rub her legs and back. Dehner would then move his hand beneath K.S.'s shorts and rub her buttocks. Dehner would also touch K.S. on her breasts. This type of touching occurred for approximately two years on a weekly basis.

{¶ 6} When K.S. entered high school, the touching escalated. On one occasion, K.S. was home from school and Dehner came home early from work. K.S. was watching television, and Dehner sat next to her on the floor. He began rubbing her arms, and moved

- 2 -

closer to her. He then left, and came back with a jar of Vaseline. Dehner removed K.S.'s pants and "pried" her legs open. Dehner then inserted his middle finger into the Vaseline and then inserted it into K.S.'s vagina. K.S. tried to push Dehner away, but Dehner was six feet tall and weighed 250 pounds compared to K.S. who was 5'2" and weighed 115 pounds. Dehner continued to digitally penetrate K.S. on a monthly basis, and also performed cunnilingus on her. Dehner told K.S. that he was preparing her for future boyfriends and that she had too much estrogen that needed to be released from her body through orgasm.

{¶ 7} During K.S.'s sophomore year, the touching and abuse escalated further. One afternoon after school, Dehner forced K.S. onto the floor and tried to have intercourse with her, but he was unable to maintain an erection so that only the tip of his penis came in contact with K.S.'s vagina. Dehner would then try to initiate intercourse with K.S. at least twice a week. Also during this time, Dehner forced K.S. to perform oral sex on him, and he also inserted his fingers into K.S.'s anus.

{¶ 8} During K.S.'s junior year, the touching and abuse continued. Dehner began keeping a "tab" of monies he spent on K.S. for things that she needed or wanted, and Dehner would make her "repay" the tab through sexual acts. Dehner forced K.S. to perform oral sex acts on him, and also performed "exams" on K.S. when she would complain of physical ailments such as menstrual cramping. On one occasion, Dehner performed an "exam" to determine whether K.S. had a yeast infection. On another occasion when K.S. complained of cramping, Dehner forced her onto the bathroom sink, pried her legs open and used his fingers to determine if "anything looked out of place or wrong in his eyes."

{¶ 9} Also during K.S.'s junior year, she befriended a classmate. K.S. began spending time with the classmate and formed a bond with the classmate's mother. K.S. shared with the classmate's mother that Dehner was molesting her, and the classmate's mother shared that she too had been molested as a child. The classmate became jealous of

the bond shared between her mother and K.S., and wrote K.S. a note stating that she should get over the abuse and face reality. K.S., who read the note before English class, broke down in tears. K.S.'s English teacher came over to K.S. and spoke to her in the hallway. K.S. then recalled the years of molestation and stated that she was ready to report the sexual abuse. K.S.'s English teacher and other school administrators helped K.S. report the sexual abuse, and K.S. gave a statement to a child services agency, as well as the police, and K.S.'s father was informed.

{¶ 10} K.S. left Dehner's home and made up a story that she was staying with a friend. During that time, K.S. continued to tell police and child services workers about the history of abuse. At one point, Detective John Pavia had K.S. make a "controlled call" whereby K.S. called Dehner and told him that she had recorded all of the sexual abuse in a journal.[1] During the call, K.S. brought up specific instances of sexual abuse and then told Dehner that she had written about those instances in the journal. Instead of denying the abuse, Dehner told K.S. that she was wrong for having written about their relations and that those instances were supposed to have been kept between them privately.

{¶ 11} Dehner was arrested and charged with one count of gross sexual imposition and seven counts of rape. Dehner pled not guilty to the charges, and the matter proceeded to a jury trial that had two days of voire dire and five days of testimony. The jury found Dehner guilty of gross sexual imposition and six of the seven counts of rape, and the trial court sentenced him to 45 years in prison and a $20,000 fine. Dehner was also designated a Tier III sexual offender. Dehner now appeals his convictions and sentence, raising four

---

1. According to Detective Pavia, a "controlled call is basically where someone will come into the police department, normally the victim of an offense, and they would make contact with the defendant or suspect in the case. At that time we would go over the case or she would say stuff about the case to try to elicit a response from the - - from the suspect in the case acknowledging that the offense occurred."

assignments of error. For ease of discussion we will address Dehner's second and third assignments of error together, as they are interrelated.

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY ON THE JURY'S VERDICT BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 14} Dehner argues in his first assignment of error that his convictions were not supported by the manifest weight of the evidence.

{¶ 15} A manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 16} While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997).

- 5 -

{¶ 17} Dehner was convicted of one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), which states,

> no person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> the other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 18} The state provided evidence that when K.S. was approximately ten or 11 years old, Dehner had sexual contact with her. K.S. testified that on Wednesday nights, K.S.'s grandmother and Mark would go to bingo, leaving her and Dehner alone in the house together. During this time, Dehner would rub K.S.'s legs and back. Dehner would then move his hand beneath K.S.'s shorts and rub her buttocks, and would also touch K.S. on her breasts. This sexual contact happened on a weekly basis when K.S. was less than 13 years old.

{¶ 19} Dehner was also convicted of six counts of rape in violation of R.C. 2907.02(A)(2), which states, "no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The "force" requirement "need not be overt and physically brutal, but can be subtle and psychological." *State v. Rankin*, 12th Dist. Clinton No. CA2004-06-015, 2005-Ohio-6165, ¶ 47. "The force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988). A child's will can be overcome by fear and duress when an important figure of authority tells the child to do something, and commands the child not to tell anyone about it. *Id.* So "long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.* at 59.

{¶ 20} The state presented evidence that Dehner compelled K.S. by force or threat of force to engage in sexual conduct with him. K.S. testified that Dehner was an authority figure to her ever since he moved into the home she shared with her father and grandmother. Dehner was the one who gave permission for K.S. to socialize, and K.S. testified that Dehner was very controlling over her life. K.S. testified that she did not tell anyone of the sexual conduct because she was afraid that Dehner would force her and her father from the home and that they would be homeless. K.S. also testified that she was forced to have the sexual conduct, such as digital penetration, cunnilingus, and fellatio, with Dehner because he would get very angry with her when she would fight him, and that he threatened to take away her phone, car, or spending money. More than the psychological force employed by Dehner, K.S. also testified that Dehner would pry her legs open in order to digitally penetrate her, and that he forced his fingers into her anus when she refused to turn her body over.

{¶ 21} While Dehner argues that his convictions are against the manifest weight of the evidence because K.S.'s testimony was not credible and because the state had no other corroborating evidence, the record indicates otherwise. By virtue of its verdict, the jury found K.S.'s testimony credible, along with the other evidence the state presented. One such piece of evidence was the controlled call made by K.S. to Dehner when she was at the police station reporting the years of abuse to Detective Pavia. Detective Pavia told K.S. to call Dehner and tell him that she had kept a journal of the sexual conduct between the two of them.

{¶ 22} During the phone call, the following exchange occurred.

> [K.S.] * * * it talks about when I have given you a blow job or when I've give - - given you a hand job. Like, if - -
>
> [Dehner] Does it mention me?
>
> [K.S.] It mentions - - it mentions you by name and, like, everything that we've done.

[Dehner]  That's not good.

[K.S.]  Yeah, so what am I supposed to say?  Like, it talks about, like, how you've come and seen me in the shower; * * * it talks about when we were locked in the house and you ate me out. Just basically everything, the kind of sex that we've had.

[Dehner]  Well, Sweetie, you shouldn't have kept that.

[K.S.]  Well, I mean, I don't know who you want me to talk to.  I - - I haven't told anything to anybody, so the most I'm going to get is from a diary.

* * *

[Dehner]  Well, it can get me in trouble.

[K.S.] How?

[Dehner]  Because you're writing all that stuff down.  If somebody gets their hands on it, that's like, you know, enough to put me away* * *.

* * *

[K.S.] I know, but what I'm saying is, like, if I don't find it and Dad does find it, what - - what am I supposed to say?

[Dehner] Just - - I don't know.  Say you were just writing for a book or something, it was imaginary.

[K.S.]  Yeah, and I put you and I in a situation like that.

[Dehner]  Well, it would be easier to explain it away that way.

* * *

[K.S.] I mean, it even has, like - - do you remember that time when, like, you thought I had a yeast infection so you took me in - - in your guys' bedroom, and, like, basically checked me out to make sure, like, it - - nothing was seriously messed up inside of my vagina?

[Dehner]  Yeah.

[K.S.]  Okay.  Well, it has that in there.

* * *

- 8 -

[Dehner] I said I was on the hook. I said you're not on the hook for it, I am.

[K.S.] Why?

[Dehner] Honey, you really want me to get in trouble?

[K.S.] No, but - -

[Dehner] That is really not good.

* * *

[Dehner] [W]e need to get rid of that. * * * Because I mean that kind of thing would get me in a lot of trouble.

[K.S.] How so?

[Dehner] I just told you.

[K.S] All right, I'm going to get a - -

[Dehner] You know what I said about that all along, was it - - that stayed between you and I so –

[K.S.] Yeah, well, sometimes I need someone to talk to, but that's why my diary was there. That's my new best friend.

[Dehner] I understand that, but here again that needed to be really, really well concealed, understand?

{¶ 23} While Dehner argues that he did not admit to touching K.S. in a sexual manner during the phone call, the jury was free to infer otherwise. Dehner did not deny K.S.'s contention during the phone call that the two had sexual contact, including cunnilingus and fellatio, or that Dehner performed "exams" on her vaginal area. Dehner also made reference to how the contact they had with each other was supposed to have stayed between the two of them and that it needed to be "really, really well concealed." The jury was therefore free to infer from the phone call that Dehner had forced K.S. to have sexual conduct with him.

{¶ 24} The state also presented testimony from several witnesses regarding the way in which K.S. reported the abuse, how school officials became involved, and how the police

investigation occurred. The jury was in the best position to judge the credibility of the state's witnesses, and to determine whether their testimony supported what K.S. had testified to, and whether K.S.'s testimony was credible.

{¶ 25} After reviewing the entire record and weighing the evidence and all reasonable inferences, including the credibility of the witnesses, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that Dehner's convictions must be reversed and a new trial ordered. As Dehner's convictions were not against the manifest weight of the evidence, his first assignment of error is overruled.

{¶ 26} Assignment of Error No. 2:

{¶ 27} THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO CONSECUTIVE PRISON TERMS.

{¶ 28} Assignment of Error No. 3:

{¶ 29} THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO SEVEN-YEAR TERMS OF IMPRISONMENT.

{¶ 30} Dehner argues in his second and third assignments of error that the trial court erred by sentencing him to seven-year sentences on the rape charges and running the sentences consecutively.

{¶ 31} As we recently noted in *State v. Crawford*, 12th Dist. Clermont No. CA2012-12-088, 2013-Ohio-3315, "the standard of review set forth in R.C. 2953.08(G)(2) shall govern all felony sentences." *Id.* at ¶ 6, quoting *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 7; *see also State v. Cochran*, 10th Dist. Franklin No. 11AP-408, 2012-Ohio-5899, ¶ 52. Pursuant to R.C. 2953.08(G)(2), when hearing an appeal of a trial court's felony sentencing decision, "the appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing." However, as explicitly stated in R.C.

2953.08(G)(2), "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion."

{¶ 32} Instead, an appellate court may take action authorized by R.C. 2953.08(G)(2) only if the court "clearly and convincingly finds" that either: (1) "the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;" or (2) "[t]hat the sentence is otherwise contrary to law." A sentence is not clearly and convincingly contrary to law where the trial court considers the purposes and principles of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, and sentences appellant within the permissible statutory range. *Crawford* at ¶ 9; *State v. Elliott*, 12th Dist. Clermont No. CA2009-03-020, 2009-Ohio-5926, ¶ 10.

{¶ 33} In making such a determination, it is "important to understand that the clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative." *Crawford* at ¶ 8, quoting *Venes*, 2013-Ohio-1891 at ¶ 21. "It does not say that the trial judge must have clear and convincing evidence to support its findings." *Id.* Instead, "it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings." *Id.* Simply stated, the language in R.C. 2953.08(G)(2) establishes an "extremely deferential standard of review" for "the restriction is on the appellate court, not the trial judge." *Id.*

{¶ 34} Dehner was convicted of felonies of the third and first degree. According to R.C. 2929.14(A)(3)(b), the proper range for a felony of the third degree "shall be nine, twelve, eighteen, twenty-four, thirty, or thirty-six months." According to R.C. 2929.14(A)(1), " for a felony of the first degree, the prison term shall be three, four, five, six, seven, eight, nine, ten, or eleven years." The trial court sentenced Dehner to three years on the gross sexual imposition charge, and seven years on each rape charge, with all sentences to run consecutively. Therefore, the individual sentences, including the seven-year sentences for

each rape charge, are within the statutory range as prescribed by sentencing guidelines.

{¶ 35} The trial court sentenced Dehner after stating that it had considered a presentence investigation report, the victim impact statement, the circumstances of the case, the principles and purposes of sentencing, and that it had balanced the pertinent seriousness and recidivism factors. The sentences are, therefore, not clearly and convincingly contrary to law.

{¶ 36} Regarding the consecutive nature of the sentences, the trial court made the requisite findings. According to R.C. 2929.14(C)(4),

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 37} This court and others have found that a trial court is not required to state any talismanic language when imposing a sentence. *State v. Kuykendall,* 12th Dist. Clermont No. CA2004-12-111, 2005-Ohio-6872, ¶ 24. "The statutory language itself does not have magical powers. Instead, it is merely a vehicle to ensure that the trial court engaged in the required

analysis." *Id.* However, there must be some reference in the record that the trial court considered the statutory requirements and made the requisite findings. *Id.*

{¶ 38} The record indicates that the trial court made the necessary findings. During sentencing, the trial court stated, "I have again considered 2929.11, -.12, and -.13 as well as 2929.14(C)(4)(a), (b), and (c). I've considered the record. I've considered the evidence that was presented in this case." The court went on to state,

> I believe that consecutive sentences are necessary to protect the public from future crime. You did this over a period of 10 years almost, 8 years and perhaps more than that. I think it's necessary to punish you, and I believe that your conduct and the danger that you pose to the public in – in the future that a single sentence would not adequately serve the purposes and principles of sentencing.
>
> I believe that these offenses were so great and so harmful, again, that no single term for any one of these offenses would adequately reflect the seriousness of your conduct. And these were sent - - I mean, there are six acts of rape for which you were convicted, and one count of gross sexual imposition that you were convicted. But there were certainly more than that that. I mean, this * * * was an 8-year period of time where you were just absolutely terrorizing this young lady.

{¶ 39} While the trial court expressly made some findings that tracked the language of R.C. 2929.14(C)(4), the trial court need not have used the exact language when making its findings. Although using the statutory language expressly demonstrates that the trial court engaged in the required analysis, we find that the language employed by the trial court in this instance demonstrates that it engaged in the required analysis when making the requisite findings.

{¶ 40} Even though it may be true that the trial court did not use the statutory phrase "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," the trial court specifically found that "no single term for any of these offenses would adequately reflect the seriousness of your

conduct." The trial court then went on to reiterate the seriousness of Dehner's crimes, including the fact that the convictions were limited to seven instances of rape and gross sexual imposition out of the eight to ten years of perpetual abuse that occurred. Therefore, the record clearly indicates that the trial court properly sentenced Dehner to consecutive sentences after engaging in the required analysis and after making the necessary findings.

{¶ 41} Moreover, the record supports the trial court's findings regarding the statutory factors. The record demonstrates that Dehner, who was 66 years old at the time he was sentenced, perpetuated years of terrorizing sexual abuse upon his stepgrandchild from the time that she was ten or 11, and began inappropriately touching her years before that. Dehner used his authority over K.S. to control her life, and to force her to submit to his sexual desires, performing sex acts upon her and demanding that she perform acts upon him. These acts included digital penetration, cunnilingus, fellatio, as well as digital penetration of the anus. Dehner would require K.S. to perform sexual acts in order to pay down her "tab," or the list of expenses Dehner paid on behalf of K.S. As demonstrated by Dehner's statement in the presentence investigation report (PSI), Dehner showed no remorse for his crimes. Instead, Dehner continued to deny his acts, and "blame[d]" K.S. for walking around the house in her bra and panties and for being "promiscuous." The record demonstrates that the trial court's findings were supported by the evidence and circumstances of the case.

{¶ 42} Having found that the sentence was not contrary to law and that the trial court made the requisite findings, Dehner's second and third assignments of error are overruled.

{¶ 43} Assignment of Error No. 4:

{¶ 44} THE TRIAL COURT ERRED IN IMPOSING A FINE UPON APPELLANT.

{¶ 45} Dehner argues in his final assignment of error that the trial court erred in imposing a $20,000 fine upon him.

{¶ 46} According to R.C. 2929.18, a trial court may impose a financial sanction based

- 14 -

upon a felony conviction. R.C. 2929.19(B)(5) states, "before imposing a financial sanction under section 2929.18 of the Revised Code * * *, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine."

{¶ 47} "Although preferable for appellate review, a trial court need not explicitly state in its judgment entry that it considered a defendant's ability to pay a financial sanction. Rather, courts look to the totality of the record to see if this requirement has been satisfied." *State v. Henderson*, 4th Dist. Vinton No. 07CA659, 2008-Ohio-2063, ¶ 7. There are no express factors that must be considered or specific findings made regarding the offender's ability to pay. *State v. Dandridge*, 12th Dist. Butler No. CA2003-12-330, 2005-Ohio-1077, ¶ 6. "All that is required under R.C. 2929.19(B)[(5)] is that the trial court '*consider* the offender's present or future ability to pay.'" (Emphasis sic.) *State v. Martin*, 140 Ohio App.3d 326, 327 (4th Dist.2000). Compliance with the statute can be shown when a trial court considers the defendant's presentence investigation report that details personal and financial information. *Dandridge* at ¶ 6.

{¶ 48} While there is no mention of Dehner's ability to pay financial sanctions in the transcript of the sentencing hearing, the trial court stated that it had "certainly" reviewed the PSI submitted to the court. The PSI provides information regarding Dehner's current and future ability to pay financial sanctions, including his age, health, education, and work history. Specifically, the PSI contains information that Dehner received wages between $2,000-$5,000 monthly, that he received an additional $1,950 in social security payments monthly, and that he had $232,000 in assets. At no time during the sentencing hearing, even after the fine was imposed, did Dehner argue that he was not able to pay the fine or in any way disagree with the information contained in the PSI that would allow the trial court to consider whether Dehner had the ability to pay the fine. We therefore find that the trial court complied with R.C. 2929.19(B)(5) before ordering financial sanctions, and Dehner's final assignment of

error is overruled.

**{¶ 49}** Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.