[Cite as *State v. Cook*, 2020-Ohio-3411.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 14-19-26

      v.

CHRISTOPHER G. COOK,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2017 CR 0249

Judgment Affirmed

Date of Decision: June 22, 2020

APPEARANCES:

    *Alison Boggs* for Appellant

    *Melissa A. Chase* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Christopher G. Cook ("Cook"), appeals the July 3, 2019 judgment of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} In December 2014, Cook's son, C.C., was staying with Cook and Cook's mother, Patricia Cook ("Patricia"), at Patricia's house in Union County. Cook and C.C.'s mother, Amanda Cook ("Amanda"), had divorced three years earlier, and C.C. was staying with Cook and Patricia to celebrate the Christmas holiday. When C.C. was returned to Amanda on Christmas Eve, he appeared upset. At that time, C.C. told Amanda that he did not want to see Cook anymore because he believed that Cook was dealing drugs.

{¶3} One month later, in January 2015, C.C. revealed additional information to Amanda about Cook. C.C. told Amanda that Cook had touched him inappropriately. Amanda was also told that Cook paid two women to have sexual intercourse with C.C. The next day, C.C. attempted to jump out of a moving vehicle, prompting Amanda to take C.C. to the emergency room at Memorial Hospital in Marysville, Ohio. There, C.C. told a physician assistant that he was hearing voices and that the voices told him to hurt himself by running into traffic. C.C. also disclosed that Cook had forced him to have sex with two different women. Due to

concerns about C.C.'s suicidal ideations and auditory hallucinations, C.C. was transferred to a specialized mental health facility in Zanesville, Ohio.

{¶4} C.C. was released after a brief stay at the Zanesville facility. Because C.C. had disclosed sexual abuse to Amanda and to the medical staff at Memorial Hospital, he was then taken to the Child Assessment Center at Nationwide Children's Hospital ("CAC") for evaluation and treatment. During an interview at the CAC, C.C. disclosed numerous instances of sexual abuse. He disclosed that, beginning in the fall of 2014, two women, whom he identified as Jessica and Jackie, touched his penis on several occasions. C.C. also stated that Cook made him touch the women's breasts and vaginas. According to C.C., these incidents culminated over the course of a weekend in December 2014, when he was forced by Cook to have sexual intercourse with both women. C.C. also disclosed that Cook once touched his penis after he got out of the shower. Finally, C.C. stated that Cook had shown him pornographic videos and that Cook had threatened to kill him and his family if he told anybody about the abuse.

{¶5} On November 21, 2017, the Union County Grand Jury indicted Cook on nine counts: Counts One and Two of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(3), (F), fourth-degree felonies; Counts Three, Five, and Six of rape in violation of R.C. 2907.02(A)(1)(b), (B), first-degree felonies; Counts Four, Seven, and Eight of gross sexual imposition in violation of R.C.

2907.05(A)(4), (C)(2), third-degree felonies; and Count Nine of intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(B)(1), (D), a third-degree felony. (Doc. No. 1). On November 29, 2017, Cook appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 6).

{¶6} On June 5, 2018, Cook filed a notice of alibi. (Doc. No. 42). In his notice of alibi, Cook claimed that he "was at the home of, or in the presence of" Patricia from December 19-24, 2014—the time period specified in the original indictment during which Counts One through Six and Count Nine were allegedly committed. (*Id.*).

{¶7} On May 13, 2019, the State entered a nolle prosequi with respect to Count Two of the indictment. (Doc. No. 87). That same day, the trial court dismissed Count Two without prejudice. (Doc. No. 88).

{¶8} A jury trial commenced on May 13, 2019. Cook twice moved for a judgment of acquittal under Crim.R. 29; the trial court denied Cook's motion on both occasions. (May 14, 2019 Tr. at 151, 161); (May 15, 2019 Tr. at 89). Before the matter was submitted to the jury, the trial court amended the indictment to reflect that Count One occurred "in a continuing course of criminal conduct in Union County, Ohio, Franklin County, Ohio, and Hardin County, Ohio" and that Counts Five and Six occurred "in a continuing course of criminal conduct in Union County,

Ohio and Hardin County, Ohio." (Doc. No. 98). In addition, with respect to all counts of the indictment, the trial court amended the date ranges of the offenses to reflect that the offenses allegedly took place between September 9, 2014 and December 25, 2014. (*Id.*). On May 15, 2019, the jury found Cook guilty of Counts One, Three, Four, Five, Six, and Nine of the amended indictment. (Doc. Nos. 90, 91, 92, 93, 94, 97). However, the jury found Cook not guilty of Counts Seven and Eight of the amended indictment. (Doc. Nos. 95, 96).

{¶9} A sentencing hearing was held on July 3, 2019. (Doc. No. 104). The trial court sentenced Cook as follows: 12 months in prison on Count One, 25 years to life in prison on Count Three, 48 months in prison on Count Four, 25 years to life in prison on Count Five, 25 years to life in prison on Count Six, and 24 months in prison on Count Nine. (*Id.*). The trial court ordered that the prison sentences for Counts One, Three, Four, Five, Six, and Nine all be served consecutively for an aggregate term of 82 years to life in prison. (*Id.*).

{¶10} Cook filed his notice of appeal on August 2, 2019. (Doc. No. 112). Cook raises seven assignments of error for our review. For the sake of clarity, we begin by addressing Cook's second assignment of error, followed by his third assignment of error. Then, we consider Cook's first and seventh assignments of error together before turning to Cook's fourth assignment of error. Finally, we conclude by separately addressing Cook's fifth and sixth assignments of error.

## Assignment of Error No. II

**The trial court erred when it permitted hearsay evidence throughout the trial when the declarant was available to testify and did in fact testify.**

{¶11} In his second assignment of error, Cook argues that the trial court erred by admitting various hearsay statements at his trial. Cook focuses on hearsay contained in the testimony of Dustin Ford ("Ford"), a physician assistant who was working in the emergency room at Memorial Hospital in Marysville, Jennifer Sherfield ("Sherfield"), a forensic interviewer and mental health advocate at the CAC, and Dr. Megan Letson ("Dr. Letson"), a doctor working at the CAC. (*See* Appellant's Brief at 5-7). He also points to hearsay contained in the video recording of C.C.'s forensic interview with Sherfield at the CAC, and he arguably takes issue with hearsay contained in the CAC written report and in C.C.'s medical records from Memorial Hospital. (*See id.* at 5-7). In all instances, C.C. is the person who made the out-of-court statements to which Cook now objects. Cook argues that none of C.C.'s statements is admissible under Evid.R. 803(4), the exception to the rule against hearsay allowing for the admission of statements made for purposes of medical diagnosis or treatment. (*Id.* at 6-7).

{¶12} "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). *See HSBC Bank U.S.A., Natl. Assn.*

*v. Gill*, 1st Dist. Hamilton No. C-180404, 2019-Ohio-2814, ¶ 6-10 (documenting a split between courts of appeals concerning the proper standard of review to apply when reviewing the admission of hearsay but concluding that *McKelton* and other Supreme Court decisions dictate abuse-of-discretion review). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶13} Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay is not admissible unless an exception applies. Evid.R. 802. "'Evid.R. 803 is one such rule which permits the admission of certain hearsay statements even though the declarant is available as a witness.'" *State v. Bender*, 3d Dist. Union No. 14-19-22, 2020-Ohio-722, ¶ 12, quoting *Dayton v. Combs*, 94 Ohio App.3d 291, 300 (2d Dist.1993).

{¶14} As relevant to this case, Evid.R. 803(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "'The hearsay rules except statements made for the purpose of medical diagnosis or treatment due to the inherent reliability

underlying the nature of those statements.'" *Bender* at ¶ 13, quoting *State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 94 and citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 39. "'[S]tatements made for the purpose of medical diagnosis and treatment are considered reliable because "'facts reliable enough to be relied on in reaching a diagnosis have sufficient trustworthiness to satisfy hearsay concerns.'"'" *Id.*, quoting *Lykins* at ¶ 95, quoting *State v. Dever*, 64 Ohio St.3d 401, 411 (1992), quoting McCormick, *Evidence*, Section 250 (4th Ed.1992), and citing *Muttart* at ¶ 41.

{¶15} Initially, we must address Cook's argument that C.C.'s out-of-court statements are not admissible under Evid.R. 803(4) because the people to whom C.C. made the statements were not "given the complete medical history of [C.C.]," which would have revealed "the mental illness that [C.C.] experienced since he was a young child." (Appellant's Brief at 7). Cook notes that, in addition to experiencing mental health issues since he was young, C.C. was treated at an inpatient mental health facility in the months before he made the statements and just days before his interview at the CAC. (*Id.* at 1). He also notes that C.C. was on "some form of medication" and that he was suffering from hallucinations and "other delusionary/psychosis instances" around the time that he made the statements. (*Id.*). Cook thus suggests that even if C.C. made these statements for purposes of medical diagnosis or treatment and the statements were reasonably pertinent to his diagnosis

-8-

or treatment, these statements should not have been admitted because, due to C.C.'s psychological issues, his statements are not entitled to the presumption of reliability typically accorded to statements made for purposes of medical diagnosis or treatment. (*See id.* at 6-7).

{¶16} We disagree. "'Where the totality of the circumstances fail to demonstrate a lack of reliability or trustworthiness, * * * statements should be admitted if they fall within the hearsay exception, [and] the credibility of the statements may then be evaluated by the trier of fact.'" *State v. Diaz*, 8th Dist. Cuyahoga No. 103878, 2016-Ohio-5523, ¶ 45, quoting *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 28. In addition, "a court may admit a child's statements under Evid.R. 803(4) if they are made for purposes of medical diagnosis or treatment provided there is no evidence to cast doubt upon the child's motivation for making the statements." *In re D.L.* at ¶ 29, citing *State v. Wilson*, 4th Dist. Adams No. 99CA672, 2000 WL 228242 (Feb. 18, 2000). In this case, although C.C. was suffering from hallucinations and suicidal ideations in the days and weeks leading up to the making of his statements, there is no indication in the record that C.C.'s hallucinations or ideations influenced his statements. Sherfield testified that during her interview with C.C., she did not observe anything that suggested that he was actively experiencing hallucinations. (May 13, 2019 Tr., Vol. II, at 214). Furthermore, Dr. Letson testified that C.C. denied any suicidal ideation

on the day of his interview. (*Id.* at 231). Though Ford's testimony suggests that C.C. may have been hearing voices when he was evaluated by Ford, there is nothing in Ford's testimony clearly indicating that C.C.'s statements to Ford were the product of his auditory hallucinations.

{¶17} Moreover, there is nothing in the record casting doubt on C.C.'s motivations to make these statements. Amanda denied that she pressured C.C. to make allegations against Cook, and there is nothing in the record suggesting that Amanda or C.C. had a reason to fabricate allegations against Cook. (*See* May 13, 2019 Tr., Vol. II, at 160). Specifically, the State presented evidence establishing that Amanda had full custody of C.C., that Cook did not have any court-ordered parenting time with C.C., and that Cook had not petitioned the court to change the custody arrangement. (*Id.* at 136-137, 160); (May 14, 2019 Tr. at 116); (State's Ex. 1). Therefore, the circumstances fail to demonstrate a lack of reliability and trustworthiness. Provided that C.C.'s statements satisfy the requirements of Evid.R. 803(4), or another exception to the hearsay rule, C.C.'s statements are properly admissible notwithstanding the fact that he was experiencing psychological difficulties around the time the statements were made. C.C.'s mental state at the time he made the statements was but another factor to be considered by the trier of fact in assessing the credibility of C.C.'s out-of-court statements. *See* Evid.R. 806(A) ("When a hearsay statement * * * has been admitted in evidence, the

credibility of the declarant may be attacked * * * by any evidence that would be admissible for those purposes if declarant had testified as a witness."); Evid.R. 616(B) ("A defect of capacity, ability, or opportunity to observe, remember, or relate may be shown to impeach the witness either by examination of the witness or by extrinsic evidence.").

{¶18} We now consider whether the trial court erred by permitting the admission of C.C.'s out-of-court statements, beginning with the trial court's decision to allow Ford to testify about what C.C. disclosed during the examination at Memorial Hospital. Ford testified that on January 16, 2015, he was working as a physician assistant in the emergency department of Memorial Hospital in Marysville. (May 13, 2019 Tr., Vol. II, at 178). He stated that he was responsible for performing the initial evaluation of C.C. and collecting C.C.'s medical history when C.C. appeared for treatment. (*Id.* at 178-181). Ford testified that the medical history is a "very important" part of a patient's medical diagnosis and treatment. (*Id.* at 180). Ford stated that C.C.'s "first chief complaint was suicidal ideation which * * * means that they have the intent to cause harm specifically to themselves." (*Id.* at 181). He testified that he had to make sure that there would not "be anything else that could be causing [C.C.] to have suicidal ideation, including infection or some type of illness that could cause harm to their mental status." (*Id.*). Ford stated that when he asked C.C. about his desire to harm himself,

C.C. said that "he had auditory hallucinations * * * and they were telling him to run out in the road to kill himself." (*Id.*). Ford then testified, over Cook's objection, that after C.C.'s initial statement about experiencing auditory hallucinations, C.C. "mentioned that * * * he was being forced to have sexual intercourse with females and touching their breasts and vagina" and that his father was forcing him to do so. (*Id.* at 181-185). Ford stated that based on his initial evaluation of C.C., along with lab tests and a physical exam, "nothing * * * seemed to be pointing towards a specific reversible cause [for C.C.'s suicidal ideations] and, therefore, mental health evaluation by Maryhaven then was consulted." (*Id.* at 186). Finally, he testified that Maryhaven "came in and evaluated [C.C.] and * * * deemed that [C.C.] was fit for transfer to a higher facility to have inpatient psych evaluation" and that C.C. was subsequently transferred to a hospital in Zanesville for further treatment. (*Id.* at 187-188).

{¶19} We conclude that the trial court did not abuse its discretion by allowing Ford to testify regarding C.C.'s statements because C.C.'s statements were made for purposes of medical diagnosis or treatment and were pertinent to C.C.'s diagnosis or treatment. Amanda brought C.C. to the emergency room of Memorial Hospital after he threatened to harm himself, and he was interviewed by Ford, a medical professional, in a hospital setting. Ford posed questions to C.C. that were designed to help Ford and other medical professionals identify the cause of C.C.'s

suicidal ideations. *See State v. Geboy*, 145 Ohio App.3d 706, 720-721 (3d Dist.2001) ("[Evid.R. 803(4)] has been interpreted as to include diagnosis and treatment of psychological injuries as well as physical ailments."). In response to Ford's questions, C.C. revealed that he was experiencing auditory hallucinations, and apparently without prompting by Ford, C.C. disclosed that Cook had been making him engage in sex acts with multiple women. There is no indication that Ford questioned C.C. in a leading or suggestive manner or that Ford began the evaluation with the goal of eliciting a disclosure of sexual abuse. *See Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, at ¶ 49. Furthermore, although there is no evidence in the record regarding C.C.'s perception of Ford's evaluation, we believe that it is reasonable to conclude that C.C. likely knew that he was speaking to Ford for purposes of medical treatment and that C.C. was aware of the need to be forthright with Ford. *See id.*; *State v. Jennings*, 2d Dist. Clark No. 2002 CA 78, 2003-Ohio-4429, ¶ 18 ("[W]e believe that it is reasonable to conclude that a ten-year-old girl being examined by a doctor in a pediatrician's office assumes that she is there for the purposes of medical treatment."). Thus, considering the particular circumstances of C.C.'s disclosure to Ford, we conclude that C.C.'s statements to Ford were made for purposes of medical diagnosis or treatment.

{¶20} In addition, C.C.'s statements were pertinent to diagnosing the cause of his suicidal ideations. As Ford's testimony suggests, there are many reasons that

someone might be experiencing suicidal ideations, and a disclosure of sexual abuse can be relevant to determining the exact cause of suicidal ideations. For example, the disclosure of sexual abuse could help medical practitioners determine whether sexual abuse exacerbated an underlying psychological condition, which condition caused the person to contemplate self-harm, or whether the person's suicidal ideations are a response to the distress of sexual abuse otherwise unrelated to an underlying or preexisting psychological condition. Therefore, C.C.'s disclosure of sexual abuse was reasonably pertinent to diagnosing the cause of his suicidal ideations. Because C.C.'s statements to Ford satisfy the requirements of Evid.R. 803(4), we conclude that the trial court did not abuse its discretion by allowing Ford to testify regarding the statements C.C. made during the initial evaluation at Memorial Hospital.

{¶21} Having concluded that the trial court did not abuse its discretion by admitting the hearsay contained in Ford's testimony, we next consider whether the trial court erred by admitting any hearsay contained in Sherfield's testimony, in Dr. Letson's testimony, in the video recording of Sherfield's interview with C.C. at the CAC, in the CAC written report, or in C.C.'s medical records from Memorial Hospital. At the outset, we note that during the course of their testimonies, Sherfield and Dr. Letson did not testify concerning anything C.C. said to them about the

alleged sexual abuse. Accordingly, there are no hearsay issues with respect to Sherfield's testimony or Dr. Letson's testimony.

{¶22} Furthermore, we note that Cook failed to object when the video recording of Sherfield's interview with C.C. at the CAC was played for the jury, and he failed to object when the State moved to admit the video recording of the CAC interview, the CAC written report, and C.C.'s medical records from Memorial Hospital.

{¶23} Because Cook failed to object to the admission of the hearsay embedded in the aforementioned documentary evidence, we review for plain error. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 72, citing *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, ¶ 66. We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

{¶24} We first consider whether the admission of the statements C.C. made to Sherfield during his CAC interview and to Dr. Letson rises to the level of plain error. At the beginning of her interview with C.C., Sherfield explained to C.C. that it was her job to talk to children "about their bodies" and "whether or not something has happened to their bodies," and she told C.C. that he would be seeing a doctor after the interview. (State's Ex. 4). She also explained to C.C. that it was acceptable if he did not know the answer to a question she asked and that she did not "want [C.C.] to make anything up, and [she did not] want [C.C.] to guess." (*Id.*). C.C. then asked Sherfield whether he would "have to tell [her] everything that [he] told [his] mom." (*Id.*). Sherfield said that "it depend[ed]," and she asked C.C. what he had told Amanda. (*Id.*). At that point, C.C. said that his "dad ha[d] been doing messed up things," and C.C. disclosed that he had been "raped by some girl named Jessica" and "raped by a girl named Jackie." (*Id.*). C.C. specified that Cook was his father. (*Id.*).

{¶25} C.C. then began to detail various instances of sexual abuse. He disclosed that Cook "made [him] touch Jessica's boobs and her vagina" and that this was what he was referring to when he said that Jessica raped him. (*Id.*). C.C. stated that "it happened quite a few times." (*Id.*). Sherfield then asked C.C. to tell her "everything about the last time that something happened with Jessica." (*Id.*). C.C. said that he was "raped in December" during a weekend approximately two weeks

before Christmas and that the incident took place at Jessica's house in her bedroom. (*Id.*). He stated that he was in the bedroom with Jessica and Cook when it happened. (*Id.*). C.C. said that Cook "wanted [him] to have sex with [Jessica]" and that Cook "bribed" him and Jessica. (*Id.*). According to C.C., Cook promised to pay Jessica $300. (*Id.*). C.C. said that Jessica "told [him] to lay down with her. And then she took off all her clothes. And then she started unbuttoning [his] pants. And [he] said stop." (*Id.*). He stated that after he told Jessica to stop, Cook offered to pay him $50 if he had sex with her. (*Id.*). C.C. said that he told Cook "maybe" and that Jessica "kept on unbuttoning [his] pants while [he] was rebuttoning them." (*Id.*). C.C. stated that Cook then offered him $100 and that he finally agreed. (*Id.*).

{¶26} According to C.C., after he accepted Cook's offer of $100, Jessica "started humping [him]." (State's Ex. 4). Jessica "was on the top, and [he] was on the bottom." (*Id.*). C.C. described his use of the word "humping" as signifying that Jessica "was going up/down on our privates." (*Id.*). He stated that his clothes were off during this encounter and that while Jessica was going "up/down on [his] privates," his "wiener" was touching the inside of her vagina. (*Id.*). C.C. said that while this was happening with Jessica, Cook was recording the incident with his phone. (*Id.*). According to C.C., he "kept on telling her to stop. And [Cook] kept on saying 'Keep up.'" (*Id.*).

-17-

{¶27} C.C. said that on the same day as the encounter with Jessica, Cook also touched his "wiener." (*Id.*). C.C. stated that after the incident with Jessica, he was taking a shower at Patricia's house. (*Id.*). He said that when he got out of the shower, Cook "was standing in the doorway" and "grabbed [his] wiener and started rubbing it." (*Id.*).

{¶28} C.C. then discussed incidents involving Jackie. C.C. disclosed that Jackie "raped [him] in December, [on] the same weekend" as Jessica. (State's Ex. 4). He stated that "the day after Jessica touched [him] and raped [him], Jackie pulled off her clothes in front of [him] and started humping [him] with [his] clothes on." (*Id.*). According to C.C., Jackie then undressed him and had sex with him. (*Id.*). He said that this encounter took place in Cook's bedroom at Patricia's house. (*Id.*). C.C. stated that Jackie was on top, that he was on bottom, and that her "boobs [were] to [his] chest and her vagina [was] to [his] wiener." (*Id.*). He said that his "wiener" was inside of Jackie's vagina. (*Id.*). C.C. stated that Cook was not present during this incident and that he did not know whether Cook had promised to pay Jackie. (*Id.*).

{¶29} C.C. then disclosed that sometime prior to Christmas Eve, Cook had offered to pay him $300 to touch Jackie's breasts and vagina. (*Id.*). He said that this encounter happened at Jackie's house. (*Id.*). He stated that Cook made him "rub [Jackie's] vagina all around" with his hand and that Cook made him "do things

to [Jackie's] boobs." (*Id.*). C.C. said that he touched both the outside and the inside of Jackie's vagina and that he "just kind of rubbed [Jackie's] nipple." (*Id.*). He also said that Cook was present during this incident and that he "was recording it with his phone." (*Id.*). In addition, C.C. stated that he was "very worried" about the incidents that occurred with Cook, Jessica, and Jackie because Cook "said he would kill [C.C.'s] whole family if [C.C.] told anybody about that." (*Id.*).

{¶30} Finally, C.C. stated that Cook showed him a "porn video" on his phone. (*Id.*). He said that the video depicted one woman "shoving" objects "up her butt," including a ball and a glass object that looked "like a missile," which "somehow she squeezed * * * out through her butt." (*Id.*). C.C. said that another woman and a man then entered the frame and that the man "started having anal sex" with one of the women. (*Id.*). He also said that the man "shoved his wiener in a girl's mouth." (*Id.*).

{¶31} The CAC written report contains the notes Sherfield made during her interview with C.C. The statements in Sherfield's report that qualify as hearsay are, for the most part, identical to the statements C.C. made in the recorded interview. (*See* State's Exs. 4, 6). The CAC written report also contains Dr. Letson's comments, along with the comments of her fellow, Dr. Melissa Jones ("Dr. Jones"). (State's Ex. 6). To the extent that these comments address C.C.'s disclosures, they

recount what C.C. said during the forensic interview or cover the same subject matter. (*See id.*).

{¶32} We conclude that the trial court did not commit plain error by permitting the admission of the recorded interview or the CAC written report because the hearsay contained within these items of evidence is admissible under Evid.R. 803(4). First, with respect to C.C.'s statements to Drs. Letson and Jones, C.C. made these statements to doctors in the context of a medical examination in a hospital setting. There is no indication that they posed suggestive or leading questions to C.C. or that C.C. did not understand the importance of telling them the truth. Thus, given the facts of this case, C.C.'s statements to Drs. Letson and Jones are admissible under Evid.R. 803(4) for much the same reason as the hearsay in Ford's testimony is admissible under Evid.R. 803(4).

{¶33} In addition, the statements C.C. made to Sherfield during his forensic interview are admissible under Evid.R. 803(4). In her testimony, Sherfield explained the purposes of her interview with C.C. She testified that, in addition to sexual abuse, the interview is used to "screen all kids for * * * different forms of maltreatment," including domestic violence and exposure to pornography, because sexual abuse is frequently accompanied by other forms of abuse. (May 13, 2019 Tr., Vol. II, at 200). Sherfield stated that the forensic interview "guides [the child's] medical exam and * * * any mental health recommendations" and that the

information collected from the forensic interview is provided to a physician. (*Id.*). She also testified that the forensic interview "completely guides the medical exam" because "it might highlight the need for sexually transmitted infection testing" or "the need or recommendation for mental health counseling and services." (*Id.* at 207). Furthermore, at the beginning of the interview, C.C. was informed that he would be speaking to a doctor after the interview. (State's Ex. 4). Therefore, Sherfield's forensic interview with C.C. was conducted, at least in part, for purposes of medical diagnosis or treatment, and C.C. was made aware that the interview had some connection to medical care.

{¶34} Moreover, C.C.'s disclosures during the interview were reasonably pertinent to his diagnosis or treatment.

> [T]he Supreme Court has "classified information regarding the identity of the perpetrator, the type of abuse alleged, the identification of the areas where the child had been touched and the body parts of the perpetrator that had touched her, as well as the time frame of the abuse, as statements for diagnosis and treatment because that information allowed the doctor or nurse to determine whether to test the child for sexually transmitted diseases, and to identify any trauma or injury sustained during the alleged abuse."

*State v. C.C.B.*, 10th Dist. Franklin No. 18AP-782, 2019-Ohio-3631, ¶ 36, quoting *In re C.S.*, 10th Dist. Franklin No. 11AP-667, 2012-Ohio-2988, ¶ 14, citing *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 32, 38. Concerning the identity of the perpetrator, the identification of the perpetrator is pertinent to diagnosis or treatment because the identity of the perpetrator is "particularly relevant" to determining whether the child victim could have continued exposure to the perpetrator and whether the child might have contracted a sexually transmitted disease. *Dever*, 64 Ohio St.3d at 413, fn. 8. The identity of the perpetrator is also relevant to determining the psychological effects on the child. *Id.* Finally, to the extent that exposure to pornography can be considered a form of sexual abuse, statements relating to a child's exposure to pornography can be relevant to the child's treatment or diagnosis. *See State v. Watts*, 10th Dist. Franklin No. 15AP-951, 2016-Ohio-5386, ¶ 23.

{¶35} Here, C.C.'s disclosures included the identities of his abusers, explanations of the extent of Cook's involvement in the abuse, identifications of the parts of his body that were touched, identifications of the parts of his abusers' bodies that he touched, the number of times he was abused, the locations where he was abused, the approximate time frame in which he was abused, the fact that he had been exposed to pornography, and the fact that he had been recorded engaging in sex acts. All of these disclosures were pertinent to diagnosing C.C., providing him

with appropriate physical and psychological treatment, and ensuring his future safety. Accordingly, C.C.'s statements during the forensic interview were made for purposes of medical diagnosis or treatment and were reasonably pertinent to his diagnosis or treatment. Therefore, C.C.'s statements are admissible under Evid.R. 803(4), and the trial court did not plainly err by permitting their admission.

{¶36} Finally, we conclude that the trial court did not commit plain error by allowing the admission of C.C.'s medical records from Memorial Hospital. In these records, Ford documented what C.C. told him during the course of the initial evaluation. (*See* State's Ex. 8). Ford's testimony covered these same statements. Because we concluded that the trial court did not abuse its discretion by allowing Ford to testify to what C.C. told him during the initial evaluation, we cannot conclude that the trial court plainly erred by permitting the admission of a document containing substantially the same statements.

{¶37} Cook's second assignment of error is overruled.

## Assignment of Error No. III

**The trial court erred when it would not allow a lay witness opinion testimony.**

{¶38} In his third assignment of error, Cook argues that the trial court abused its discretion by refusing to permit Patricia to offer her opinion on whether she believed C.C.'s allegations. He contends that Evid.R. 701 permits opinion testimony by lay witnesses under certain circumstances and that Patricia was

qualified to give opinion testimony under Evid.R. 701 because "[t]he foundation had been laid throughout her testimony as to her relationship and observations of C.C. and [Cook] * * * and she could properly form an opinion 'on the fact in issue.'" (Appellant's Brief at 8).

{¶39} "An abuse of discretion standard applies to a trial court's decision to admit testimony under Evid.R. 701." *State v. Smith*, 10th Dist. Franklin No. 16AP-21, 2017-Ohio-9283, ¶ 45, citing *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113 (1989) and *State v. Griffin*, 10th Dist. Franklin No. 10AP-902, 2011-Ohio-4250, ¶ 58. As noted earlier, an abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *Adams*, 62 Ohio St.2d at 157-158.

{¶40} Evid.R. 701 provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." In this case, Cook's trial counsel asked Patricia the following two questions: (1) "Based on what you know in your relationships with both [Cook and C.C.], do you believe these accusations?" and (2) "Do you have any reason to believe these things actually happened?" (May 14, 2019 Tr. at 177). The State objected to both of these questions, and the trial court sustained both of the State's objections. (*Id.*). Cook argues that the trial court erred by

-24-

sustaining the State's objections because Patricia's opinion about the truth of C.C.'s allegations was based on her perceptions of Cook and C.C. around the time the events allegedly occurred and helpful to the determination of whether the events alleged by C.C. actually happened—"the fact in issue." (Appellant's Brief at 8).

{¶41} We conclude that the trial court did not abuse its discretion by sustaining the State's objections and preventing Patricia from answering Cook's trial counsel's questions. Regardless of how Cook describes his trial counsel's questions or the opinions he expected Patricia to express, it is evident that his trial counsel's questions were designed to elicit Patricia's opinion about the credibility of C.C., who had earlier testified against Cook, and accordingly, Cook's trial counsel's questions were improper. "'In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'" *Smith* at ¶ 46, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988) (Brown, J., concurring). "Opinion testimony regarding another witness's credibility 'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.'" *Id.*, quoting *Eastham* at 312 (Brown, J., concurring). "Thus, 'the opinion of a witness as to whether another witness is being truthful is inadmissible.'" *Id.*, quoting *State v. Potter*, 8th Dist. Cuyahoga No. 81037, 2003-Ohio-1338, ¶ 38, citing *State v. Miller*, 2d Dist. Montgomery No. 18102, 2001 WL 62793 (Jan. 26, 2001). It is possible

that Patricia could have been questioned regarding C.C.'s general character for truthfulness or untruthfulness in an effort to undermine his credibility. *See* Evid.R. 608(A) ("The credibility of a witness may be attacked * * * by evidence in the form of opinion * * *, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness * * *."). However, Cook's trial counsel's questions concerned C.C.'s credibility with respect to his particular allegations against Cook, rather than his general character for truthfulness, and the questions were thus improper. *See State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 115 ("While Evid.R. 608(A) permits testimony regarding a witness's general character or reputation for truthfulness, the rule prohibits testimony regarding a witness's truthfulness on a particular occasion."). Therefore, the trial court did not abuse its discretion by sustaining the State's objections and precluding Patricia from opining about whether she believed C.C.'s allegations. *See State v. Sanchez-Garza*, 12th Dist. Butler No. CA2016-02-036, 2017-Ohio-1234, ¶ 44-48 (concluding that the State's line of questioning, in which a witness was asked whether she believed what the victim had told her shortly after the alleged incident, was an improper attempt to bolster the victim's credibility); *Pawlak* at ¶ 111-125 (question by juror, which queried whether witness "believe[d] the allegations of inappropriate activity with [her] boyfriend [were] true," was improper because the

witness's response "required her to give an opinion about [the defendant's] guilt and the credibility of the victims as they pertain to the allegations").

{¶42} Cook's third assignment of error is overruled.

### Assignment of Error No. I

**The jury lost its way when reviewing the evidence, resulting in a verdict that is against the manifest weight of the evidence and sufficiency of the evidence.**

### Assignment of Error No. VII

**The trial court erred when it overruled appellant's motion for a Criminal Rule 29 acquittal.**

{¶43} In his first and seventh assignments of error, Cook argues that because the State failed to present evidence sufficient to establish his guilt on each of the six counts for which he was convicted, the trial court erred by denying his Crim.R. 29 motion for acquittal, and he contends that his convictions are otherwise based on insufficient evidence. In addition, in his first assignment of error, Cook argues that his convictions are against the manifest weight of the evidence. Specifically, Cook argues that because C.C. did not provide reliable, consistent testimony at trial and because the State's only other evidence against him was inadmissible hearsay, his convictions are against the manifest weight of the evidence. (*See* Appellant's Brief at 4).

{¶44} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶45} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386. Because the purpose of a Crim.R. 29 motion for acquittal "is to test the sufficiency of the evidence presented

at trial," we "review[] a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim." *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 9, citing *State v. Terry*, 12th Dist. Fayette No. CA2001-07-012, 2002-Ohio-4378, ¶ 9, citing *State v. Williams*, 74 Ohio St.3d 569, 576 (1996); *State v. Lightner*, 3d Dist. Hardin No. 6-08-11, 2009-Ohio-544, ¶ 11, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995).

{¶46} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v.*

*Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶47} In this case, Cook was convicted of six offenses. With respect to three of these offenses—disseminating matter harmful to juveniles, gross sexual imposition, and intimidation of an attorney, victim, or witness in a criminal case—Cook was convicted as the principal offender.

{¶48} The offense of disseminating matter harmful to juveniles is codified in R.C. 2907.31, which provides: "No person, with knowledge of its character or content, shall recklessly * * *[,] [w]hile in the physical proximity of the juvenile * * *, allow any juvenile * * * to review or peruse any material or view any live performance that is harmful to juveniles." R.C. 2907.31(A)(3). "If the material or performance involved is obscene and * * * the juvenile who is allowed to review, peruse, or view it is under thirteen years of age, [disseminating matter harmful to juveniles] is a felony of the fourth degree." R.C. 2907.31(F). "Harmful to juveniles" means

> that quality of any material or performance describing or representing
> nudity, sexual conduct, sexual excitement, or sado-masochistic abuse
> in any form to which:
>
> (1) The material or performance, when considered as a whole,
> appeals to the prurient interest of juveniles in sex[;]

(2)   The material or performance is patently offensive to prevailing

standards in the adult community as a whole with respect to what is

suitable for juveniles[; and]

(3)   The material or performance, when considered as a whole, lacks

serious literary, artistic, political, and scientific values for juveniles.

R.C. 2907.01(E).

{¶49} The offense of gross sexual imposition is codified in R.C. 2907.05, which provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4). "Sexual contact" is defined in R.C. 2907.01(B) as meaning "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." "Whether touching is done for the purpose of sexual gratification is a 'question of fact to be inferred from the type, nature, and circumstances surrounding the contact.'" *State v. Todd*, 3d Dist. Hardin No. 6-16-11, 2017-Ohio-4355, ¶ 12, quoting *In re K.C.*, 1st Dist. Hamilton No. C-140307, 2015-Ohio-1613, ¶ 32.

{¶50} The offense of intimidation of an attorney, victim, or witness in a criminal case is codified in R.C. 2921.04, which provides, in relevant part:  "No

-31-

person, knowingly and * * * by unlawful threat of harm to any person * * * or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder * * * [t]he victim of a crime * * * in the filing or prosecution of criminal charges * * *." R.C. 2921.04(B)(1). "The term 'threat' represents a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, ¶ 39. "'Intimidation' by definition involves the creation of fear in a victim, and the very nature of a threat is the creation of fear of negative consequences for the purpose of influencing behavior." *Id.* at ¶ 40. However, R.C. 2921.04(B)(1) does not proscribe intimidation by mere "threats"; it proscribes intimidation by means of "unlawful threats." Thus, the statutory language in R.C. 2921.04(B)(1) proscribing intimidation by "unlawful threats" is satisfied "only when the very making of the threat is itself unlawful because it violates established criminal or civil law." *Id.* at ¶ 42. Furthermore, R.C. 2921.04(B)(1) does not require that a victim actually be influenced, intimidated, or hindered by the defendant's unlawful threats; "the defendant need only *try* to create fear about *or* try to influence or hinder the filing or prosecution of criminal charges." (Emphasis sic.) *State v. Thompson*, 7th Dist. Columbiana No. 13 CO 20, 2014-Ohio-1225, ¶ 16, citing R.C.

-32-

2921.04(B). "There is no requirement that the victim feel intimidated." *Id.*, citing *State v. Williams*, 8th Dist. Cuyahoga No. 94261, 2011-Ohio-591, ¶ 14.

{¶51} With respect to the other three counts for which Cook was convicted, Cook was convicted of three counts of complicity to the rapes of C.C. The offense of rape is codified in R.C. 2907.02, which provides, in relevant part, that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person" and that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(1)(b), (2). As relevant to this case, "sexual conduct" includes "vaginal intercourse between a male and female" and, "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another." R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." *Id.*

{¶52} R.C. 2923.03, Ohio's complicity statute, provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2).

To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "'"Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed."'" *State v. Wright*, 3d Dist. Hardin No. 6-15-14, 2016-Ohio-5465, ¶ 9, quoting *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 21 (12th Dist.).

{¶53} The offenses of which Cook was convicted involve, to some extent, three different degrees of culpable mental state—purpose, knowledge, and recklessness. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "A person acts knowingly, regardless of purpose, when the person is

aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.* "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.* "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶54} In addition to the evidence referenced in our analysis of Cook's second assignment of error, the following evidence was presented at Cook's trial. Amanda was the State's first witness. Amanda first identified State's Exhibit 2 as a certified copy of C.C.'s birth certificate. (May 13, 2019 Tr., Vol. II, at 138-139); (State's Ex. 2). C.C.'s birth certificate shows that he was ten years old in September 2014 through December 2014. (State's Ex. 2). Amanda testified that although Cook did not have court-ordered rights to parenting time with C.C., she entered into an

agreement with Cook to allow him to visit with C.C. as long as C.C. wanted to visit. (May 13, 2019 Tr., Vol. II, at 139-140). She stated that C.C. visited with Cook almost every weekend in 2014 and that the initial visits appeared to be normal. (*Id.* at 140-141). However, she noted that the visits began to taper off in the fall of 2014 when C.C. wanted to go over less often or Cook was unable to take C.C. (*Id.* at 143).

{¶55} She testified that she first became aware of potential problems between C.C. and Cook when, on Christmas Eve, C.C. stated that he did not want to have further visits with Cook because he believed that Cook was a drug dealer. (*Id.* at 144). Amanda testified that she then reached out to law enforcement and an investigation was opened. (*Id.* at 145-146). According to Amanda, C.C. next disclosed problems with Cook in January 2015 when she was driving him to receive infusion treatments for his juvenile arthritis. (*Id.* at 146-148). She testified that C.C. said that Cook had touched him and paid two women to have sex with him. (*Id.* at 146-148). Amanda stated that she responded to C.C.'s comments by again reaching out to law enforcement and by scheduling the evaluation at the CAC. (*Id.* at 148-149). Moreover, Amanda testified that, the day after he disclosed the alleged sex abuse, C.C. tried to jump out of a moving vehicle. (*Id.* at 149-150). She stated that she took him to Memorial Hospital for evaluation, where he was then transferred to the Zanesville facility. (*Id.* at 149-150).

{¶56} On cross-examination, Amanda was questioned about whether she told Cook on Christmas Eve that she was cutting off visitation with C.C. (*Id.* at 156-157). She testified that she was frustrated that Cook dropped off C.C. later than requested, but she could not remember whether she told Cook when he dropped off C.C. that there would be no more visitation. (*Id.* at 158). She further denied that she encouraged C.C. to make allegations against Cook in order to terminate Cook's visitation. (*Id.* at 160).

{¶57} Concerning C.C.'s mental health, Amanda testified that C.C. was diagnosed with oppositional defiant disorder at the age of three, but that C.C. did not experience auditory hallucinations at that age. (May 13, 2019 Tr., Vol. II, at 161). Amanda also stated that C.C. was admitted to the Zanesville mental health facility on two other occasions: once in the beginning of September 2014 and once at the end of January 2015 following the interview at the CAC. (*Id.* at 162-165). She testified that C.C. was placed on medication after being discharged from the facility in September and that he did not respond well to the medication. (*Id.* at 162-163). She said that C.C. was placed on different medications beginning in December 2014 but that he was taken off medication completely when he was first admitted into the Zanesville facility in January 2015. (*Id.* at 167). Amanda also testified that when C.C. was first admitted into the facility in January 2015, he said that he was hearing voices and being chased by a tall black man. (*Id.* at 163).

Finally, she testified that C.C. was readmitted to the facility at the end of January 2015 because he was still threatening to harm himself and others. (*Id.* at 164-165).

**{¶58}** In addition, Lieutenant Michael Justice ("Lieutenant Justice") of the Union County Sheriff's Office testified that he was present during the execution of a search warrant at Patricia's house, which was where Cook was staying in January 2015. (May 13, 2019 Tr., Vol. II, at 233). He testified that one of the items seized during the search was a cell phone, which was later determined to belong to Cook. (*Id.* at 236-237). Lieutenant Justice stated that he extracted and reviewed video files that were stored on the SD card in Cook's cell phone. (*Id.* at 241-242). He also testified that two prescription pill bottles were recovered from Patricia's house. (*Id.* at 243-244). He stated that the prescriptions were in the name of "Jacqueline Tackett" and that the bottles said they were filled on November 8, 2014 and December 31, 2014. (*Id.* at 243-244); (State's Exs. 16, 17). Furthermore, Lieutenant Justice testified that, during the search, he located a Crown Royal bag filled with drug paraphernalia. (May 13, 2019 Tr., Vol. II, at 244-245); (State's Ex. 18). Lieutenant Justice stated that he did not know when the prescription bottles arrived at Patricia's house or who brought them there and that he could not determine with certainty who owned the Crown Royal bag. (May 13, 2019 Tr., Vol. II, at 249-250, 253-254).

{¶59} C.C. was the State's next witness. C.C. first testified about the alleged incidents with Jessica. He testified that, in 2014, he and Cook would go to Jessica's apartment in Columbus at least once a month and that Patricia would sometimes accompany them. (May 14, 2019 Tr. at 16). C.C. stated that the third time Cook brought him inside of Jessica's apartment, Cook offered to pay him and Jessica money if he and Jessica did "[s]exual stuff." (*Id.* at 17). He stated that the incident happened in Jessica's bedroom and that he tried to resist Jessica, but that they eventually started having sex. (*Id.* at 18). C.C. testified that his "wiener" was inside of Jessica's vagina and that Jessica was on top of him going "[u]p and down." (*Id.* at 18-19). However, C.C. could not remember whether he was wearing clothes during the incident or what Cook was doing. (*Id.* at 18-19). C.C. recalled that this encounter happened in November or December of 2014. (*Id.* at 20).

{¶60} C.C. then testified that Cook "touched [him] when [he] was getting out of the shower" at Patricia's house. (*Id.* at 20-21). He said that Cook touched him for "[t]en seconds, maybe," that he did not remember if Cook said anything to him during the incident, and that after Cook "let go," nothing else happened. (*Id.* at 22).

{¶61} C.C. also testified about the series of incidents with Jackie. He stated that Jackie lived in an apartment in Kenton in the fall and winter of 2014 and that Cook took him to Jackie's apartment a number of times, though he could not

remember how often he went to Jackie's. (*Id.* at 23-24). According to C.C., Patricia may have gone to Jackie's apartment with him and Cook on one occasion. (*Id.* at 24). C.C. testified that "[t]hree or four things" happened with Jackie. (*Id.*). After describing an earlier incident with Jackie, C.C. stated that Jackie was offered money to have sex with him by Cook. (*Id.* at 25). C.C. testified that they then went to one of the upstairs bedrooms in Jackie's apartment, where he and Jackie had sex. (*Id.* at 26). He stated that his "wiener" was inside of Jackie's vagina, that Jackie was on top of him, and that he believed his clothes were on, except for his pants which were pulled down to his knees. (*Id.* at 26-27). C.C. reiterated that Cook offered Jackie money, but he could not remember whether Cook offered him money to have sex with Jackie. (*Id.* at 27). He stated that this incident happened in August or September of 2014. (*Id.*). C.C. testified that after this encounter, nothing else ever happened with Jackie. (*Id.* at 27-28).

{¶62} In addition, C.C. stated that he was shown a video by Cook on Cook's cell phone depicting a "woman shoving a ball in her butt hole." (May 14, 2019 Tr. at 28). He testified that the video also showed the woman "us[ing] a glass dildo" and "shov[ing] it up her butt hole." (*Id.*). C.C. stated that he did not remember how long the video was or whether he watched it from beginning to end. (*Id.*).

{¶63} Finally, C.C. testified that Cook threatened to kill him and his entire family. (*Id.* at 29). The following exchange then took place:

[The State]:   And when did he tell you this?

[C.C.]:   Since I was like four.

[The State]:   Since you were four years old?

[C.C.]:   Yeah, but I think then he was joking.  Something about

like when he was saying it changed when I started like

nine.

[The State]:   And what changed? Can you tell us?

[C.C.]:   He just seemed like he was more serious.

[The State]:   In 2014, what, if anything, did he say to you about

telling?

[C.C.]:   He said he'd kill my entire family.

[The State]:   Did you believe him?

[C.C.]:   Yes.

(*Id.*).

{¶64} On cross-examination, C.C. testified that though he told Amanda on Christmas Eve that he thought Cook was a drug dealer, he did not tell anybody, including Amanda, Patricia, or law enforcement officers, about the abuse until January 2015.  (*Id.* at 36, 55-56).  He stated that although he went back to Patricia's house after he had sex with Jessica, he did not tell Patricia, and he explained that he did not tell Patricia because of Cook's threats.  (*Id.* at 40-41).  Similarly, C.C.

testified that after he had sex with Jackie at Jackie's apartment, he went back to Patricia's house but did not tell Patricia, or anyone else, about what had happened. (*Id.* at 45-46).

{¶65} Additionally, C.C. stated that Jessica and Jackie were present when Cook threatened to "kill everyone" and that Cook made the threats "right after [they] got done having sex." (May 14, 2019 Tr. at 47). He confirmed that Cook had been telling him things like that since he was four years old but that when Cook threatened him in 2014, he believed Cook was being sincere. (*Id.* at 48). C.C. acknowledged that he did not tell Amanda or Patricia about the threats. (*Id.*).

{¶66} C.C. was then questioned about whether he remembered Amanda telling Cook that he was not going to have any further visitation with C.C. C.C. testified that he remembered coming back from Jessica's with Cook and Patricia on Christmas Eve 2014. (*Id.* at 50). He also remembered that when he left Cook and Patricia to go with Amanda, Amanda was upset because Cook had not dropped off C.C. earlier in the day. (*Id.* at 51). However, he could not recall whether Amanda told Cook anything about cutting off visitations. (*Id.*).

{¶67} Regarding his history of mental health issues, C.C. testified that he first began hearing voices at age four, but that he did not tell Amanda or anyone else. (*Id.* at 56-57). He stated that he was hearing voices in September 2014 when he was first admitted into the mental health facility in Zanesville, and he

remembered threatening to harm himself and trying to jump out of Amanda's car. (*Id.* at 57-58). He also testified that he started taking medication when he was released from the facility and that the medication helped at first. (*Id.* at 59). C.C. testified that he did not remember going back to the facility in January 2015 and that he did not remember the hallucinations he reported at the time. (*Id.* at 60).

{¶68} Furthermore, C.C. acknowledged that he continued to call and visit with Cook even after the abuse started and that he called or texted Cook at least once after Christmas Eve 2014. (May 14, 2019 Tr. at 65-66). However, C.C. could not remember whether he called Cook to request visitation. (*Id.* at 66).

{¶69} Finally, C.C. testified that he remembered going to the CAC for the interview, but that he did not remember the interview itself. (*Id.* at 61). He said that he viewed the video recording of the interview a couple days before trial, though he still did not remember the interview. (*Id.* at 62). When Cook's trial counsel asked him whether "the only thing [he] remember[ed] * * * is what [he had] seen on the tape of the interview," C.C. responded that he "remember[ed] some of it just not specific days and when it was." (*Id.* at 68). He admitted that some of his testimony might not be completely accurate. (*Id.*).

{¶70} On redirect examination, C.C. testified that although he was incapable of remembering all of the details of the alleged abuse, he had done "very well" in telling the truth in his testimony. (*Id.* at 70). He also reiterated that he did not tell

Patricia about the abuse because he believed Cook's threat extended to her. (*Id.*at 71).

{¶71} The State's next witness, Cindy Kuhr ("Kuhr"), a Victim's Specialist Consultant for the Bureau of Criminal Investigation, testified as an expert on the subject of child sexual abuse. (May 14, 2019 Tr. at 73, 78). Kuhr first testified about the phenomenon of delayed reporting of sexual abuse. (*Id.* at 78-81). She stated that "the majority of the time there is a delay in disclosure" of sexual abuse and that there can be a number of causes for delayed reporting, such as the existence of a close relationship between the abuser and the victim or the victim's fear of physical retaliation by the abuser. (*Id.* at 79-80). Kuhr testified that many children who delay reporting sexual abuse also disclose sexual abuse in increments instead of disclosing all instances of abuse at once. (*Id.* at 81-82). In addition, Kuhr stated that although children have been known to fabricate allegations of sexual abuse, she had not personally dealt with false accusations. (*Id.* at 88). She noted that when dealing with allegations of sexual abuse, investigators explore whether the child has any motive to make a false accusation. (*Id.*).

{¶72} Kuhr also testified about some of the behavioral indicators of child sexual abuse. She stated that age-inappropriate information about sexual activity might indicate that a child has been sexually abused. (*Id.* at 84). She also noted that sexually-abused children often act out physically and sexually toward others, that

they engage in "[h]igh risk behaviors where [they are] putting themselves in danger," and that they can display "suicidal gestures." (*Id.*).

{¶73} In addition, Kuhr testified about her experience with children who testify in court about sexual abuse. She stated that it is "usually very, very difficult for them to testify in the first place" and that "testifying about traumatic or * * * embarrassing information for them is very difficult * * * [and] they may shut down." (*Id.* at 87). She testified that some children "will just give some of the basic information" while others are "able to testify * * * clearly from beginning to end as they did during their disclosure." (*Id.* at 87-88). Finally, elsewhere in her testimony, Kuhr testified that trauma affects memory and that the trauma of an event "can impact the memory and make individuals * * * kind of forget certain things around the time of a traumatic experience and only remember the important details of something or * * * sensory things * * *." (*Id.* at 86-87).

{¶74} On cross-examination, Kuhr acknowledged that she never spoke to C.C., that she was not aware of the details of C.C.'s mental health history, and that she was not present when C.C. testified. (May 14, 2019 Tr. at 90-92). She clarified that she was offering "educational witness testimony" about child sex abuse cases generally rather than testimony about C.C.'s case specifically. (*Id.* at 91-92).

{¶75} The State's final witness was Deputy Kelly Nawman ("Deputy Nawman") of the Union County Sheriff's Office. (*Id.* at 103). Deputy Nawman

was the lead investigator on C.C.'s case. (*Id.*). She testified that the investigation began as an investigation into Cook's potential drug abuse and dissemination of pornography but that the investigation evolved into one about child sexual abuse following C.C.'s disclosures to Amanda in January 2015. (*Id.* at 105-108).

{¶76} Deputy Nawman testified that she interviewed Cook during the course of the investigation. She stated that Cook denied showing pornographic images to C.C. but that Cook admitted that C.C. once viewed an image depicting a woman's breasts when a text message containing the image was sent to Cook's phone while C.C. was using the phone to play a game. (*Id.* at 113). Deputy Nawman also testified that Cook told her that C.C. had been to Jessica's house with him and Patricia and that C.C. had only been inside of Jessica's house long enough to use the restroom. (*Id.* at 114). She stated that Cook said that C.C. had also been to Jackie's house once with Cook and Patricia and once with Cook and Cook's other children. (*Id.* at 113). According to Deputy Nawman, Cook also told her that Jackie had been to Patricia's house on one or two occasions, most recently in June or July of 2014. (*Id.* at 114). With respect to C.C.'s allegations, Deputy Nawman testified that Cook said that Amanda "must have put [C.C.] up to it because he had filed for full custody." (*Id.* at 116). However, she stated that she was able to determine that Cook "had not filed for anything." (*Id.*).

{¶77} Deputy Nawman also testified about video files discovered on Cook's cell phone. Deputy Nawman identified State's Exhibit 14 as a DVD containing a true and accurate copy of a pornographic video retrieved from the SD card in Cook's cell phone. (*Id.* at 118-119, 122); (State's Ex. 14). State's Exhibit 14 depicts sex acts consistent with those that C.C. described in his interview at the CAC and in his trial testimony. (State's Ex. 14).

{¶78} On cross-examination, Deputy Nawman testified that, in January 2015, she did not talk to C.C. about the alleged sexual abuse because he was admitted to the mental health facility in Zanesville. (May 14, 2019 Tr. at 126-127). She also stated that C.C. never gave a written statement. (*Id.* at 127). Furthermore, Deputy Nawman testified that Jessica and Jackie both denied C.C.'s accusations when they were interviewed. (*Id.* at 129-130). Finally, she stated that although other pornographic videos were discovered on Cook's cell phone, no videos were recovered depicting C.C. engaging in sex acts with Jessica, Jackie, or any other person. (*Id.* at 131).

{¶79} Patricia was Cook's only witness. Patricia testified that Cook was living with her during 2014 and that C.C. would visit often between September 2014 and December 2014. (*Id.* at 163-164). She stated that she had a close relationship with C.C. and that he would tell her when things were bothering him. (*Id.* at 165).

Patricia testified that she did not notice any change in C.C.'s behavior around Christmas 2014. (*Id.* at 171-172).

{¶80} Additionally, Patricia stated that she had been to Jessica's house with Cook and C.C., but she denied that she ever went to Hardin County with Cook and C.C. in 2014. (*Id.* at 166, 168). Concerning whether Jessica or Jackie ever visited her house in Union County, Patricia testified that Jessica never visited her house but that Jackie came to her house twice in the summer of 2014. (*Id.* at 169). She stated that Jackie never spent the night at her house and that she was not aware of any times that Jackie was alone with C.C. (*Id.* at 170). Patricia testified that she did not generally allow Cook to have female friends at her house. (*Id.* at 168-169). Furthermore, Patricia doubted that Cook snuck women into her house after she went to bed. (*Id.* at 170).

{¶81} Patricia also testified about Cook's access to her car and whether Cook could have taken C.C. somewhere without her knowledge. She testified that when C.C. visited her and Cook around Christmas 2014, Cook never left in the car alone with C.C. (May 14, 2019 Tr. at 168). Patricia stated that she always accompanied Cook and C.C. during car trips during this period. (*Id.*). Patricia also testified more broadly about Cook's use of her car. She insisted that if Cook "had drove [her] car, [she] was with him." (*Id.* at 164-165). Patricia also stressed that during visitations, Cook and C.C. never left together in her vehicle without her. (*Id.* at 166). Finally,

she testified that she did not believe that Cook ever snuck out of the house with C.C. and drove around. (*Id.* at 167).

**{¶82}** On cross-examination, Patricia reiterated that, in 2014, whenever Cook left her house, she was with him. (*Id.* at 178-179). She also confirmed that she never went to Hardin County with Cook in 2014, that Jackie came to her house twice during the summer of 2014, and that Jackie never stayed overnight at the house. (*Id.* at 179-180). While Patricia testified that none of Jackie's personal belongings should have been at her house, she could not explain why State's Exhibits 16 and 17, two prescription pill bottles in Jackie's name, were found in her house. (*Id.* at 180, 182-184). She stated that Jackie had only been in the house once during the summer of 2014 and that she was "positive" that Jackie was not in her house in November 2014 or December 2014—the months that the prescriptions were filled. (*Id.* at 182-184).

**{¶83}** On redirect examination, Patricia testified that the only time that Jackie came into her house, Jackie came "[j]ust into the living room and, basically, in and right back out." (*Id.* at 187). She also stated that Cook had not told her about any other times that Jackie came to the house. (*Id.*).

**{¶84}** We begin with Cook's contention that his convictions are not supported by sufficient evidence. Initially, we note that under his first and seventh assignments of error, Cook's only argument specifically regarding the sufficiency

of the evidence supporting his convictions is that "the State's use of impermissible hearsay fell short of having sufficient evidence to support the convictions." (Appellant's Brief at 4). However, we have already concluded under Cook's second assignment of error that the hearsay to which he refers was not admitted in error.

{¶85} Other than this brief argument, the premise of which we have already rejected, Cook does not actually challenge the sufficiency of the evidence supporting his convictions. Cook does not make any argument that the State's evidence is insufficient to establish any element of any of the offenses for which he was convicted. Instead, Cook attacks C.C.'s credibility by pointing to contradictions between C.C.'s testimony and his out-of-court statements and highlighting C.C.'s inability to remember all of the details of the alleged abuse. (*Id.* at 4, 21). These arguments do not challenge the sufficiency of the evidence; rather, they challenge the weight of the evidence. *See In re T.L.*, 3d Dist. Allen No. 1-15-24, 2016-Ohio-252, ¶ 24. Nevertheless, regardless of whether Cook properly challenged the sufficiency of the evidence, we are satisfied that the State produced evidence sufficient to prove beyond a reasonable doubt each element of each offense for which Cook was convicted. Accordingly, we conclude that Cook's convictions are supported by sufficient evidence and that the trial court did not err by denying Cook's Crim.R. 29 motions.

{¶86} Having concluded that Cook's convictions are supported by sufficient evidence, we now determine whether Cook's convictions are against the manifest weight of the evidence. As just indicated, Cook's primary argument is that his convictions are against the manifest weight of the evidence because C.C.'s testimony was not credible. Cook claims that C.C.'s testimony should have been given minimal weight because of inconsistencies between his testimony and the statements he made during the CAC interview in 2015 and because he could no longer remember many of the details he disclosed during the CAC interview. We disagree. While there were discrepancies between C.C.'s testimony and the statements he made during the CAC interview, "'"[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial."'" *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 22, quoting *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 17, quoting *State v. Chandler*, 10th Dist. Franklin No. 05AP-415, 2006-Ohio-2070, ¶ 9. "A jury may take into consideration a witness's conflicting testimony in determining his or her credibility and the persuasiveness of his or her account by either discounting or resolving the discrepancies." *Id.*, citing *Jackson* at ¶ 17, citing *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 34. "'A jury, as finder of fact, may believe all, part, or none of a witness's testimony.'" *Id.*, quoting *Taylor* at ¶ 34. Likewise, the fact that C.C. was unable to

remember all of the details he disclosed in 2015 does not automatically render his testimony unreliable with respect to the details he was able to recall.

{¶87} Here, the State offered evidence by way of Kuhr's testimony to help explain why C.C.'s trial testimony might be inconsistent with certain elements of his earlier disclosures and why C.C. might not be able to recall all of the details he divulged in 2015. Cook characterizes Kuhr as a "clean-up batter" who "was permitted to tell the jury that it was okay to conclude that C.C.'s testimony was not dependable" and that "its inconsistencies are understandable and almost expected." (Appellant's Brief at 4). He claims that with Kuhr's testimony, the jury could disregard the issues with C.C.'s testimony and find him credible "because a child victim of sexual abuse would never make this kind of stuff up." (*Id.*).

{¶88} Yet, despite Cook's objections, we see no issue with Kuhr's testimony. In child-sex-abuse cases, expert witnesses like Kuhr routinely testify to matters such as delayed disclosure of child sexual abuse, recantation of allegations of sexual abuse, and inconsistent or contradictory recollections of incidents of sexual abuse. *See, e.g.*, *State v. Stowers*, 81 Ohio St.3d 260, 263 (1998) (noting that expert testimony concerning recantation and delayed disclosure "is permitted to counterbalance the trier of fact's natural tendency to assess recantation and delayed disclosure as weighing against the believability and truthfulness of the witness"). The jury was aware that Kuhr was testifying about child sexual abuse cases

generally rather than the specifics of C.C.'s case, and the jury was in a position to determine whether the phenomena Kuhr described in her testimony applied to C.C.'s testimony. To the extent that the jury evaluated C.C.'s testimony in light of Kuhr's testimony and consequently found C.C. to be credible, we cannot conclude that the jury clearly lost its way by doing so.

{¶89} Moreover, the State presented evidence other than C.C.'s testimony to establish Cook's guilt, most notably the out-of-court statements C.C. made to Ford, Sherfield, and Drs. Jones and Letson in 2015. Cook suggests throughout his appellate brief that C.C.'s out-of-court statements are untrustworthy due to the psychological problems he was experiencing around the time he made the statements. However, the jury was well aware of the mental issues that C.C. was suffering from around the time he made the statements, and it could consider these issues in determining what weight to give to C.C.'s out-of-court statements. On this record, if the jury gave C.C.'s out-of-court statements decisive weight, we cannot conclude that it was mistaken to do so.

{¶90} Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice that Cook's convictions must be reversed.

{¶91} Cook's first and seventh assignments of error are overruled.

## Assignment of Error No. IV

**The trial court erred when it amended the indictment regarding substantive issues that are not permitted to be amended by Criminal Rule 7.**

{¶92} In his fourth assignment of error, Cook argues that the trial court erred by amending the indictment. Cook argues that the amendments were not permissible under Crim.R. 7 because they affected his substantial rights. (Appellant's Brief at 9-10). With respect to the amendments relating to venue, he contends that he was entitled to a reasonable continuance and a new jury "[s]ince venue affects a substantial right." (*Id.* at 10). He further maintains that he was prejudiced by the amendments to the dates of the offenses because "[t]he expansion of the time frames * * * amounted to an ambush to his alibi and the entire presentation of his case." (*Id.* at 11).

{¶93} "Crim.R. 7(D) governs the amendment of indictments." *State v. Thompson*, 9th Dist. Wayne No. 15AP0016, 2016-Ohio-4689, ¶ 12, citing *State v. Bennett*, 9th Dist. Lorain No. 10CA009917, 2011-Ohio-6679, ¶ 8. Crim.R. 7(D) provides:

> The court may at any time before, during, or after a trial amend the
> indictment, information, complaint, or bill of particulars, in respect to
> any defect, imperfection, or omission in form or substance, or of any
> variance with the evidence, provided no change is made in the name

or identity of the crime charged. If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury.

"Crim.R. 7(D) permits most amendments but prohibits amendments that change the name or identity of the crime charged." *State v. Wilson*, 4th Dist. Lawrence No. 18CA15, 2019-Ohio-2754, ¶ 13, citing *State v. Pepka*, 125 Ohio St.3d 124, 2010-Ohio-1045, ¶ 15. "A trial court commits reversible error when it permits an amendment that changes the name or identity of the offense charged, regardless of whether the defendant suffered prejudice," and because it is a matter of law, we review de novo whether an amendment changes the name or identity of the offense charged. *Id.*, citing *State v. Kittle*, 4th Dist. Athens No. 04CA41, 2005-Ohio-3198, ¶ 10-13, citing *State v. Smith*, 10th Dist. Franklin No. 03AP1157, 2004-Ohio-4786,

¶ 10; *State v. Jones*, 2d Dist. Montgomery No. 26289, 2015-Ohio-4116, ¶ 125, citing *State v. Frazier*, 2d Dist. Clark No. 2008 CA 118, 2010-Ohio-1507, ¶ 22.

**{¶94}** However, where an amendment does not change the name or identity of the offense charged, we review a trial court's decision to allow a Crim.R. 7(D) amendment for an abuse of discretion. *Thompson* at ¶ 11, citing *State v. Gray*, 9th Dist. Summit No. 27365, 2015-Ohio-1248, ¶ 7 and *Frazier* at ¶ 23. Nevertheless, in this case, because Cook failed to object to the amendment of the indictment at trial, he is limited to a claim of plain error on appeal. *See State v. Shockey*, 9th Dist. Summit No. 29170, 2019-Ohio-2417, ¶ 7, citing *State v. Guenther*, 9th Dist. Lorain No. 05CA008663, 2006-Ohio-767, ¶ 49.

**{¶95}** In this case, the amendments changed the indictment's allegations of the venue where some of the offenses were allegedly committed and the time frame during which the offenses were allegedly committed. Generally, amending an indictment's allegations of venue or of the date or time of an offense does not change the name or identity of the crime charged. *See Shockey* at ¶ 8; *State v. Buchanan*, 8th Dist. Cuyahoga No. 104500, 2017-Ohio-1361, ¶ 19, 22; *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 24, citing *State v. Williams*, 53 Ohio App.3d 1, 5 (10th Dist.1988); *State v. Collinsworth*, 12th Dist. Brown No. CA2003-10-012, 2004-Ohio-5902, ¶ 24. Therefore, the amendments in this case were permissible under Crim.R. 7(D).

**{¶96}** Furthermore, the record supports that the amendments were necessary to conform the indictment to the evidence presented at trial. Although C.C. consistently maintained that Cook showed him a pornographic video, he did not testify regarding where he was when he viewed the video and the evidence supported one of three possible viewing locations: Patricia's house in Union County, Jackie's apartment in Hardin County, and Jessica's house in Franklin County. In addition, evidence was presented suggesting that the two rapes allegedly committed by Jackie occurred either at Jackie's apartment in Hardin County or at Patricia's house in Union County. Finally, C.C.'s testimony and the statements he made during the CAC interview offered conflicting accounts of the dates on which the offenses were committed. While the evidence supported that the alleged offenses occurred no later than Christmas 2014, the evidence also suggested that some of the incidents could have occurred as early as September. Therefore, the amendments reflected the evidence presented at trial, and accordingly, we cannot conclude that the trial court deviated from a legal rule by allowing the amendments.

**{¶97}** Finally, irrespective of whether the trial court erred by allowing the amendments, we fail to see how Cook was prejudiced. Cook argues that the expansion of the time frame in which the offenses were allegedly committed completely undermined his alibi defense. (Appellant's Brief at 11). However, Patricia, Cook's alibi witness, offered testimony that, in effect, provided Cook with

an alibi for time periods other than December 19-25, 2014. In addition to testifying that she was with Cook and C.C. during the entirety of C.C.'s December 2014 visit, Patricia also testified that whenever C.C. visited Cook in 2014, she would accompany Cook and C.C. in her car whenever Cook and C.C. left the house. Further, Patricia testified that she never went to Hardin County with Cook in 2014. Moreover, Patricia testified that Jessica had never been to her house and that Jackie had only entered her house once for a short period of time. Patricia also expressed her belief that Cook never brought women into her house without her knowledge. Patricia's testimony, if believed by the jury, almost entirely foreclosed a finding that the rape offenses, which were alleged to have occurred at either Jackie's apartment, Jessica's house, or Patricia's house, actually happened as charged in the indictment. Thus, given Patricia's testimony, we do not believe that the outcome of the trial clearly would have been different if the trial court had not permitted the amendments. Accordingly, we conclude that the trial court did not commit plain error by allowing the amendments.

{¶98} Cook's fourth assignment of error is overruled.

### Assignment of Error No. V

**Appellant was deprived effective assistance of counsel resulting in appellant not receiving a fair trial.**

{¶99} In his fifth assignment of error, Cook argues that he received ineffective assistance of counsel. Cook sorts his trial counsel's alleged deficiencies

into four categories: (1) "failure to challenge expert witness"; (2) "failure to request expert to testify on behalf of defendant"; (3) "failures to object"; and (4) "failure to object to improper character evidence." (Appellant's Brief at 13-18). Within three of the categories, Cook identifies at least two different ways in which his trial counsel allegedly failed to provide effective representation. (*Id.* at 13-18).

**{¶100}** A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶101} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶102} We start with the supposed deficiencies of Cook's trial counsel that Cook lumps into the "failure to challenge expert witness" category. Cook argues that his trial counsel acted unreasonably by not attempting to disqualify Kuhr as an expert witness via pretrial motion. He contends that his trial counsel was "on notice through discovery that the State intended to call an expert witness who would testify to the heart of the matter" and that his trial counsel "owed [it to him] * * * to try and challenge the qualifications of the expert prior to trial * * *." (Appellant's Brief at 13). Cook also claims that his trial counsel was ineffective because he "made no attempt to challenge [Kuhr's] information and ultimate qualification" at trial. (*Id.*).

{¶103} For purposes of this category of purported unprofessional error, we assume without deciding that Cook's trial counsel's failure to challenge Kuhr's qualifications was unreasonable under the circumstances. Nevertheless, we conclude that Cook has not demonstrated that he was prejudiced by his trial counsel's failure to question Kuhr's qualifications because Kuhr was manifestly qualified to testify as an expert on the subject of child sexual abuse.

{¶104} Under Evid.R. 702, a witness may be qualified as an expert witness by reason of her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). As the State aptly notes, the transcript of Cook's trial contains over four pages of testimony in which Kuhr detailed her educational background, relevant work history, certifications, publications, compliance with continuing educational requirements, affiliations with professional organizations, experience as an instructor, experience as an expert witness, and experience with victims of child sexual abuse. (May 14, 2019 Tr. at 74-78). Kuhr further testified that she is a subject-matter expert in the areas of child abuse, child sexual abuse, and child trauma. (*Id.* at 74-75). Kuhr's testimony clearly establishes that, by reason of her education, training, experience, and specialized knowledge, she is an expert on matters of child sexual abuse. Therefore, because Cook's trial counsel would almost certainly have failed to disqualify Kuhr as an expert on child sexual abuse, we cannot say that there is a reasonable probability that the result of Cook's trial would have been different had his trial counsel challenged Kuhr's qualifications. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 126 (trial counsel did not provide ineffective assistance of counsel, in part, because "the trial court implicitly accepted [the witness] as an expert and would have readily rejected any challenge to her qualifications"), citing *State v. Baston*, 85 Ohio St.3d 418, 423 (1999).

{¶105} In his next category, "failure to request expert to testify on behalf of defendant," Cook argues that his trial counsel was deficient because he "did not attempt to seek the assistance of an opposing expert witness in child sexual abuse cases when it became clear that the State's case was going to be built around an expert who would give C.C. a pass for not remembering the facts of the incidents clearly, or at all." (Appellant's Brief at 15-16). He maintains that his trial counsel had a duty to counter Kuhr's testimony with expert testimony favorable to his defense, and he argues that his trial counsel did not seek to obtain favorable expert testimony, as evidenced by the lack of a pretrial motion "seeking to explore that avenue." (*Id.* at 16).

{¶106} With respect to the supposed deficiencies contained in this category, we conclude that Cook's claim of ineffective assistance of counsel fails because he has not established that his trial counsel's performance was deficient or unreasonable under the circumstances. Cook has not demonstrated that his trial counsel actually failed to attempt to secure an expert witness to testify on his behalf. He notes that the record does not contain any motion showing that his trial counsel attempted to procure the services of an opposing expert witness. However, the absence of any such motion is equally consistent with a finding that Cook's trial counsel diligently investigated the possibility of calling an expert witness to counter Kuhr but found no expert able to offer testimony favorable to Cook or available to

do so. Moreover, even if Cook's trial counsel in fact did not try to secure expert witness testimony, "[t]he decision not to seek expert testimony is often tactical '"because such an expert might uncover evidence that further inculpates the defendant."'" *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 244, quoting *State v. Krzywkowski*, 8th Dist. Cuyahoga Nos. 83599, 83842 and 84056, 2004-Ohio-5966, ¶ 22, quoting *State v. Glover*, 12th Dist. Clermont No. CA2001-12-102, 2002-Ohio-6392, ¶ 25. *See State v. Wilson*, 5th Dist. Richland No. 17CA31, 2018-Ohio-396, ¶ 36 ("Trial counsel's failure to request an expert is a 'debatable trial tactic' * * *."). In addition, "the Ohio Supreme Court has recognized that whether to call an expert is a matter of trial strategy, and 'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *State v. Jenkins*, 2d Dist. Miami No. 2003-CA-1, 2003-Ohio-4428, ¶ 9, quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993) and citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11 (1987). Therefore, even if Cook had shown that his trial counsel actually failed to attempt to hire an expert witness, he would likely be unable to establish that his trial counsel's decision to rely solely on cross-examination of Kuhr was unreasonable or deficient under the circumstances.

{¶107} Finally, because they involve similar issues, we address the "failures to object" and "failure to object to improper character evidence" categories together. In the "failures to object" category, Cook takes issue with his trial counsel's failure

to object to various hearsay contained in Amanda's testimony, Ford's testimony, the video recording of Sherfield's interview with C.C. at the CAC, and in the CAC written report. (Appellant's Brief at 13-15). In the "failure to object to improper character evidence" category, Cook focuses on his trial counsel's failure to object to statements about his prior incarceration contained in Amanda's testimony and in State's Exhibit 1, failure to object when State's Exhibit 19 was played for the jury, and failure to object to the admission of State's Exhibits 13 and 18. (*Id.* at 16-18).

{¶108} With respect to many of these instances of allegedly deficient performance on the part of Cook's trial counsel, we can reject Cook's contentions of ineffective assistance of counsel with little difficulty. First, Cook takes exception to his trial counsel's failure to object to two hearsay statements contained in Amanda's testimony—statements C.C. made to Amanda about Cook being a drug dealer and about the sexual abuse allegedly perpetrated by Cook, Jessica, and Jackie. However, Cook's trial counsel *did* object when Amanda testified that C.C. told her that Cook touched him. (May 13, 2019 Tr., Vol. II, at 146). Although the trial court ultimately overruled the objection and allowed Amanda to complete her testimony, the objection led the trial court to give the jury a limiting instruction. (*Id.* at 147-148). Thus, concerning this portion of Amanda's testimony, Cook's trial counsel performed exactly as expected of competent counsel.

{¶109} In addition, we cannot conclude that Cook's trial counsel was ineffective with respect to the hearsay contained in Ford's statement. When Ford began testifying about C.C.'s disclosures of sexual abuse, Cook's trial counsel objected. (*Id.* at 181). Moreover, we have already concluded that the hearsay contained in Ford's testimony is admissible under Evid.R. 803(4). Therefore, respecting Cook's trial counsel's handling of Ford's testimony, Cook's trial counsel's performance was neither unreasonable nor deficient, and in any event, Cook cannot show that he suffered prejudice because the trial court properly admitted the hearsay in Ford's testimony.

{¶110} Similarly, we cannot conclude that Cook's trial counsel was deficient for failing to object to the admission of the sexual-abuse related hearsay contained in the video recording of C.C.'s interview at the CAC or in the CAC written report. As with the hearsay statements contained in Ford's testimony, we have previously concluded that C.C.'s statements concerning the circumstances of the sexual abuse and the identities of his abusers are admissible under Evid.R. 803(4). "'A defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible.' As the Supreme Court of Ohio stated, '"Counsel is certainly not deficient for failing to raise a meritless issue."'" *State v. Carter*, 8th Dist. Cuyahoga No. 104874, 2018-Ohio-2238, ¶ 47, quoting *State v. Jackson*, 8th Dist. Cuyahoga No. 86105, 2006-Ohio-174, ¶ 87, quoting *State v. Taylor*, 78 Ohio St.3d 15, 31

(1997). Accordingly, Cook's trial counsel was not deficient for failing to object to the admission of the sexual-abuse related hearsay.

{¶111} Yet, as Cook observes, C.C. made other statements to Sherfield during the course of the forensic interview at the CAC, and some of these statements do not as neatly satisfy the requirements of Evid.R. 803(4). Specifically, Cook maintains that statements C.C. made to Sherfield about Cook's alleged drug use and involvement in drug trafficking are not admissible under any exception to the hearsay rule. (Appellant's Brief at 14). He argues that his trial counsel certainly should have objected to the admission of these statements. Furthermore, as indicated above, Cook takes issue with his trial counsel's failure to object to the drug-trafficking related hearsay in Amanda's testimony, and he also contends that his trial counsel was ineffective for failing to object to the admission of State's Exhibit 18—a Crown Royal bag filled with drug paraphernalia that he characterizes as "overly prejudicial." (*Id.* at 13, 17). In a similar vein, Cook claims that he was prejudiced both by his trial counsel's failure to object to a portion of Amanda's testimony in which she indicated that Cook had previously been incarcerated and by his trial counsel's failure to object to the admission of an unredacted copy of Cook's divorce decree, which lists Cook's address as the Corrections Reception Center in Orient, Ohio. (*Id.* at 16). Cook argues that, but for his trial counsel's

failure to intervene to prevent the admission of this evidence, "it is likely the outcome of the trial would have been different." (*Id.* at 18).

{¶112} We disagree. First, we note that while Cook's trial counsel did not object when Amanda testified about Cook's prior imprisonment, the trial court eventually instructed the jury to disregard that part of Amanda's testimony. (May 13, 2019 Tr., Vol. II, at 173-174). "The jury is presumed to follow the trial court's instructions." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 103, citing *State v. Loza*, 71 Ohio St.3d 61, 75 (1994). Because there is nothing in the record suggesting that the jury ignored the trial court's instruction, we cannot conclude that this portion of Amanda's testimony contributed to the jury rendering a verdict it otherwise would not have reached.

{¶113} Additionally, we do not believe that Cook's trial counsel's failure to object to the admission of State's Exhibit 18 amounts to deficient performance. During his testimony, Lieutenant Justice began describing the Crown Royal bag and its contents before Cook's trial counsel objected. (May 13, 2019 Tr., Vol. II, at 250). Although the trial court initially sustained the objection, it eventually reversed course and allowed Detective Justice to testify about the contents of the bag. (*Id.* at 245-247). Given that the trial court overruled Cook's trial counsel's objection to Lieutenant Justice's thorough description of the Crown Royal bag and its contents, an objection to the admission of the Crown Royal bag likely would have been futile,

and Cook's "trial counsel was not required to perform a futile act." *State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 62, citing *State v. Lodge*, 2d Dist. Greene No. 2004CA43, 2005-Ohio-1908.

{¶114} Moreover, even assuming that Cook's trial counsel performed deficiently by failing to object to the admission of evidence relating to Cook's prior criminal history and alleged involvement with drugs and that this evidence was admitted in error, in light of the considerable admissible evidence of Cook's guilt, we do not believe that there is a reasonable probability that the result of Cook's trial would have been different if this evidence had not been admitted. Cook has repeatedly questioned the veracity of C.C.'s claims of sexual abuse and attacked his credibility, and at trial, C.C. was either unable to remember all of the details of the alleged sexual abuse or his descriptions of the incidents differed somewhat from the accounts he gave in 2015. Yet, C.C. was steadfast in his claims that Cook forced him to engage in sex acts with Jessica and Jackie, touched him inappropriately, exposed him to pornography, and threatened to kill him and his family. With respect to the details most critical to determining Cook's guilt, C.C.'s trial testimony largely aligned with the disclosures he made during the CAC interview, and to the extent that C.C.'s trial testimony was at variance with his CAC disclosures, Kuhr's testimony concerning the effects of child sexual abuse on memory provides a reasonable explanation for these differences. Finally, the State introduced other

evidence, such as the pornographic video found on Cook's cell phone, providing independent support for Cook's guilt and bolstering C.C.'s credibility. Accordingly, we do not believe that a few scattered references to Cook's prior incarceration and evidence of his involvement with drugs, when weighed against the evidence of his guilt, so contaminated the jury that there is a reasonable probability that the result of Cook's trial would have been different had Cook's trial counsel attempted to exclude this evidence.

{¶115} Lastly, we consider whether Cook's trial counsel was ineffective for failing to object when State's Exhibit 19 was played for the jury or for failing to object to the admission of State's Exhibit 13. State's Exhibit 19 is a video recording that depicts C.C., who appears to be approximately ten years old, playing with Cook's cat. (State's Ex. 19). In the video, Cook is heard speaking to C.C., and Cook addresses C.C. with profanity and a sharp tone at points throughout the recording. (*Id.*). C.C. testified that Cook spoke to him like that "[e]very day, at least, once." (May 14, 2019 Tr. at 31). State's Exhibit 13 is Cook's cell phone with SD card. (State's Ex. 13).

{¶116} As to State's Exhibit 19, Cook claims that it "was highly prejudicial and served no other purpose than to try and depict [him] in a very unfavorable light." (Appellant's Brief at 17). He argues that his trial counsel performed deficiently by failing to object when it was played for the jury because "[t]he prejudicial nature

outweighed any probative value and should not have been seen by the jury * * *."
(*Id.*).

{¶117} Cook's argument is without merit. In each of the three counts of rape on which Cook was indicted, it was alleged that Cook "purposely compelled [C.C.] to submit by force or threat of force." (Doc. No. 1). *See* R.C. 2971.03(B)(1)(c). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "Force or the threat of force 'can be inferred from the circumstances surrounding sexual conduct.'" *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 53 (7th Dist.), quoting *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus. "[T]he force necessary to commit rape depends upon the respective age, size, and strength of the parties and their relation to each other." *Id.*, citing *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988). "[W]hen the rape involves a child and that child's parent, or [a] person who stands in loco parentis, subtle and psychological forms of coercion sufficiently show force." *State v. Schroeder*, 4th Dist. Adams No. 18CA1077, 2019-Ohio-4136, ¶ 77, citing *State v. Shadoan*, 4th Dist. Adams No. 03CA764, 2004-Ohio-1756, ¶ 21 and *Eskridge* at 58-59. "'As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element * * * can be established.'" *Id.*, quoting *Shadoan* at ¶ 21. "A child's will can be overcome by fear and duress when [a parent] tells the child to do something, and commands the

child not to tell anyone about it." *State v. Dehner*, 12th Dist. Clermont No. CA2012-12-090, 2013-Ohio-3576, ¶ 19, citing *Eskridge* at 58.

{¶118} Here, State's Exhibit 19 was relevant to determining whether Cook exerted sufficient psychological pressure on C.C. to overcome C.C.'s will and force him to engage in sexual conduct with Jessica and Jackie. Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Evid.R. 401. Relevant evidence is generally admissible, though relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 402; Evid.R. 403(A). State's Exhibit 19 is relevant evidence because its depictions of the way that Cook talked to C.C. and the way C.C. responded to Cook, coupled with C.C.'s testimony that Cook regularly talked to him in that manner, make it more probable that Cook wielded his parental authority over C.C. to coerce C.C. into engaging in sexual conduct with Jessica and Jackie. While State's Exhibit 19 does not depict Cook in the most flattering light, we do not agree with Cook that his portrayal is so negative as to *substantially* outweigh the video's probative value. Therefore, because State's Exhibit 19 is likely admissible, we cannot conclude that Cook's trial counsel committed an unprofessional error by failing to object when it was played for the jury. *See Carter*, 2018-Ohio-2238, at ¶ 47. Regardless, given the only mildly

negative depiction of Cook in State's Exhibit 19 and the other evidence supporting the allegations that Cook pushed C.C. into engaging in sexual conduct with Jessica and Jackie, we do not believe that there is a reasonable probability that Cook's trial would have ended differently if the video had not been played for the jury.

{¶119} We also conclude that Cook has not demonstrated that he was prejudiced by his trial counsel's failure to object to the admission of State's Exhibit 13. Cook argues that State's Exhibit 13, his cell phone and SD card, "contain[ed] more video[s] than [were] shown in court" and that the admission of the cell phone and SD card "created the possibility of the jury considering evidence outside of the trial proceedings, resulting in a prejudicial influence * * *." (Appellant's Brief at 17). Cook has raised only the mere possibility that the jury viewed other videos contained on the cell phone and SD card. However, there is no indication that the jury viewed any other videos that might be stored on the cell phone and SD card and, therefore, no evidence that the jury viewed any videos that could have prejudiced Cook. If the jury did not view other videos, the admission of the cell phone and SD card could not have affected the jury's verdicts. *See State v. Carson*, 10th Dist. Franklin No. 11AP-809, 2012-Ohio-4501, ¶ 30 (noting that the defendant could not demonstrate a reasonable probability of a different trial outcome where there was no evidence that the jury actually viewed a potentially prejudicial video segment). As a result, we conclude that Cook has not established that there is a

reasonable probability that the result of his trial would have been different but for his trial counsel's failure to object to the admission of his cell phone and SD card. *See id.*

{¶120} Cook's fifth assignment of error is overruled.

**Assignment of Error No. VI**

**Appellant was denied a fair trial as a result of the cumulative errors that occurred throughout the trial.**

{¶121} In his sixth assignment of error, Cook argues that cumulative errors committed throughout the trial prevented him from having a fair trial. He argues that the following four errors, though perhaps harmless by themselves, combined to deprive him of a fair trial: (1) the trial court's decision to prevent Patricia from testifying about whether she believed that C.C.'s accusations were true; (2) the trial court's decision to allow the amendment of the indictment without advising Cook that he "was entitled to a continuance and possible discharge of the present jury"; (3) the admission over Cook's objection of State's Exhibits 16 and 17—prescription pill bottles bearing Jackie's name that were found in Patricia's house; and (4) the admission of Lieutenant Justice's testimony about the contents of the Crown Royal bag, the admission of the Crown Royal bag and its contents, and the admission of C.C.'s out-of-court statements about Cook's alleged involvement with drugs. (Appellant's Brief at 19-21).

{¶122} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.'" *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

{¶123} After reviewing the record, we conclude that Cook was not denied a fair trial by cumulative error. First, with respect to Cook's first two alleged errors, we have previously concluded that the trial court did not err by preventing Patricia from testifying about whether she believed C.C.'s allegations or by allowing the indictment to be amended pursuant to Crim.R. 7(D). Cook finds fault in the trial court's failure to advise him that he could have tried to secure a reasonable continuance or a discharge of the jury in response to the amendments. However, Crim.R. 7(D) places no obligation on the trial court to inform the defendant of his

options under the rule, and we decline to graft such a requirement onto Crim.R. 7(D).

**{¶124}** Moreover, even assuming that the trial court erred both by allowing the admission of State's Exhibits 16 and 17 and by allowing the admission of the Crown Royal bag and other evidence relating to Cook's drug use, we cannot conclude that these errors combined to deprive Cook of a fair trial. As discussed in exhaustive detail above, the State presented substantial evidence establishing Cook's guilt. Consequently, Cook cannot show that the trial court's errors in allowing this evidence to be admitted, if any, combined to deny him a fair trial. *See State v. Mathis*, 8th Dist. Cuyahoga No. 107365, 2019-Ohio-3654, ¶ 82-83.

**{¶125}** Cook's sixth assignment of error is overruled.

**{¶126}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**